## THE MANHASSET.[1]

## THE PORTSMOUTH AND BARGE 40.

LILLISTON *et ux.* *v.* THE MANHASSET AND THE PORTSMOUTH AND BARGE 40.   LILLISTON *v.* SAME.   COOPER *v.* SAME.   THE OWNERS OF THE MANHASSET *v.* THE PORTSMOUTH AND BARGE 40.

*(District Court, E. D. Virginia.   March 5, 1888.)*

1. COLLISION—BETWEEN TUG AND FERRY-BOAT—LOOKOUTS.
     The necessity of a lookout properly stationed on a steamer navigating a harbor at night is imperative.   A ferry-boat is not exempt from this obligation, and has no special privileges or exemptions not possessed by other steamers.

2. SAME—LIGHTS AND SIGNALS—OBSCURING LIGHTS.
     A tug which had placed herself on the west side of a large car float, in stress of weather, being forced thereby to leave a wharf, and attempt to reach another, in which position the colored lights of the tug were hid from a ferry-boat approaching from the other side by the intervening barge, was not, under the circumstances of the case, negligent for so doing.

3. SAME—CAR-FLOATS.
     A car-float is not required by the rules of navigation to carry any light. One which was rigged with colored lights, but was being towed backwards under the necessities of the occasion, thereby hiding her colored lights, and which had a white light on the end which was moving forwards, was not, under the circumstances of the case, guilty of negligence in the matter of lights.

4. SAME—FERRY-BOATS—RIGHT OF WAY.
     The tug and barge were not bound to delay their departure from their wharf till the ferry-boat had arrived at her dock.   Ferry-boats have no prior rights of navigation over other boats.

5. SAME—CROSSING VESSELS.
     Under the facts the position of the colliding vessels was not a case of crossing, and rule 19 does not apply.

6. SAME—FAILURE TO SIGNAL.
     Nor was it negligence in the master of the tug not to have blown several short danger whistles.

7. SAME—NEGLIGENCE.
     On the whole facts of the case the ferry-boat was solely to blame for the collision.

In Admiralty.

These were three libels against the ferry-boat Manhasset, the tug Portsmouth, and the Barge 40, jointly, and one libel against the tug and barge, for damages from collision, which were consolidated, and heard together.

The evidence submitted in these cases fills 885 type-written pages of legal-cap paper, and is augmented in volume by the usual complement of documentary exhibits.   In the main, it is very conflicting, and an undue proportion of it consists of tedious, unenlightening cross-examinations.   In stating what I conclude to be the facts of the case, it would be well if I could, in this paper, take up the evidence bearing on each contested point, balance conflicting statements, and set out my reasons

---

[1]Reported by Robert M. Hughes, Esq., of the Norfolk bar.

for adopting the conclusions arrived at. As this would be impracticable, I must follow the method pursued by the supreme court of the United States in a case in which there were but 400 pages of evidence, (*Chamberlain* v. *Ward*, 21 How. 558,) where it said:

"A particular analysis of the testimony of each witness, and a comparison of their respective statements, will not be attempted, as its effect would be to extend the investigation beyond all reasonable limits, without any practical benefit to either party. All that can be done will be to state the material facts proved. Conflicting testimony we have endeavored to reconcile, where it is possible; and when not so, we have drawn our conclusions from the weight of evidence, and the probabilities of the case. With these explanations we will proceed to state the material facts of the case."

I shall follow, in dealing with the important case before me, the authoritative example of the supreme court. From a patient study of the vast mass of evidence presented, I derive the following statement of principal facts, which includes some public facts, not in the record, but of which I take judicial notice. The upper part of Norfolk harbor is formed by the east and south branches of Elizabeth river, which flow into it from the south, Norfolk lying on the north side, Portsmouth on the south side, and Berkeley between the two rivers. The south branch passes the United States navy-yard at Gosport, and the wharves of the Seaboard Railroad of Portsmouth on the south side, before entering the harbor; the wharves of the Norfolk Southern Railroad, and of its coal pier, being on the opposite side, in Berkeley. The east branch passes the wharves of the Norfolk & Western Railroad, and of the Clyde and Old Dominion Companies' steamers on the Norfolk side; and the wharves and slips of large saw-mills and other enterprises on the Berkeley side. A considerable trade from the sounds of North Carolina comes into Norfolk harbor from the South Branch river, through the Albemarle & Chesapeake Navigation Line, and the Dismal Swamp canal, borne in vessels of light draft. A great portion of this commerce is brought into the harbor by tugs. towing very often long lines of small sail-vessels, and barges, and rafts of lumber and logs. This trade passes from south branch, between the wharves of the Seaboard Railroad on the Portsmouth side, and those of the Norfolk Southern Railroad on the other. The width of the navigation here is but about 210 or 215 yards, and this is not much less than the average width of the stream for half a mile above its mouth, including the navy-yard. This part of the river is narrow in respect to the size of the large vessels, and the number of small ones, and the heavy commerce, which pass over or lie in it. The upper part of Norfolk harbor has an average width of about half a mile, and is less than a mile in length, from the front of Berkeley to Naval Hospital point, which latter pierces the harbor from the west. Before reaching Hospital point going north out of the upper harbor, the wharves of Town point, in Norfolk, are passed to the right; that occupied a year ago by the New York, Philadelphia & Norfolk Railroad Company, one of the respondents in these libels, lying nearest on the right, and distant from the seaboard wharf at Portsmouth about four-fifths of a mile, or 1,100 yards. Continuing be-

yond Hospital point, we get into the lower part of Norfolk harbor, into which the west branch of Elizabeth river empties, and which extends about two miles to the coal pier of Lambert's point. Continuing beyond Lambert's point for a few miles, the Elizabeth river flows northward, until, in conjunction with James river, it forms Hampton roads. With respect to the increasing magnitude of its commerce, and the extraordinary dimensions of many of the ships entering it, the upper part of Norfolk harbor is constrained in size; more especially where the south branch enters it. Just at this point, and next below the wharves of the Seaboard Railroad, which have been mentioned, are the ferry slips of the Norfolk and Portsmouth ferry on the Portsmouth side; next below these slips, to the north, one or two wharves, and north of these, the Portsmouth wharves of the Old Dominion Steam-Ship Company. Finally, on the same side, is Robinson's wharf, north of which is the expanse of water called "Portsmouth Flats," which are the principal anchorage of the upper harbor, and which extend to Naval Hospital point on the west side, opposite Town point on the Norfolk side. Opposite the Portsmouth ferry slips, which have been mentioned, looking towards Norfolk, is another anchorage in front of Berkeley, called "Berkeley Flats." The boats of the Norfolk and Portsmouth ferry do not cross the harbor at right angles, but they run on a very oblique line pointing eastwardly of north 1,058 yards, to their slips at Norfolk. To these slips at Norfolk also run the ferry-boats from Berkeley, over a course about 550 yards, or about one-third of a mile, in length. One boat runs on each of these ferries, at intervals of 20 minutes at each side, in the day-time, and 30 minutes in the night. These two lines of ferriage both cross the mouth of the East Branch; and the Norfolk and Portsmouth line also crosses the mouth of the South Branch. They affect the ingress and egress of all steam-ships, tugs, sail-vessels, barges, and other craft which belong to the navigation of those two rivers. They lie upon the vitals of the upper Norfolk harbor. The ferry-boat which plies between Norfolk and Portsmouth makes but a slight offing in moving out of or into the Norfolk slip; but in leaving and entering the slip at Portsmouth, she is obliged generally to make an offing as great as two or three times her own length, or more than 300 feet, straight out from the slip. Her usual path between Norfolk and Portsmouth is therefore on a line drawn from the outer end of Norfolk slip to a point directly out 300 feet from the outer end of the Portsmouth slip. The usual time consumed by the ferry-boat in making this trip is five minutes from unhooking on one side to hooking on the other, or about four minutes from the outer end of one slip to the outer end of the other, allowing half a minute at each end for leaving the slip, and getting under way; the distance between the two points last named being 1,058 yards, (3,175 feet.) The boat's usual rate of speed, while out in the harbor, (1,058 yards in four minutes,) is nine miles an hour.

On the 28th of March, 1887, the tug-steamer Portsmouth left Cape Charles city, east of Chesapeake bay, with two very large barges in tow, which were loaded with railroad cars filled with freight. The cars and barges were so constructed that the cars could be rolled from the railroad

wharf at each end of the route to the decks of the barges, and again from the decks to the wharf. The barges which were in tow of the Portsmouth on this occasion were No. 1 and No. 40. Barge No. 1 had cars destined for the Norfolk Southern Railroad at its wharf in the South Branch river, at Berkeley; and barge No. 40 had 14 cars destined primarily for Town point, and then for the Norfolk & Western Railroad wharves on the East Branch, at Norfolk. The loaded cars each weighed some 50,000 pounds, including freight. Barge 40 was 240 feet in length and 36 feet in breadth, and drew 7 feet of water when loaded. Barge 1 was somewhat smaller in dimensions. The tug Portsmouth was 125 feet in length, and drew 10 feet of water. During the passage of tug and convoy from Cape Charles city to Lambert's point, the tug had the barges in tow, one behind the other, upon a long 80-fathom hawser. After turning Lambert's point, Capt. Cason, who was master of the tug, and had charge of the towing, took the two barges along-side and aport of the tug, barge 40 next the tug, and barge 1 on the port side of barge 40, all practically abreast. Before entering Hampton roads a high wind came down from the northward; and this wind acting on a flood-tide, which then had set in, made a very strong current under the tug and barges proceeding southward, and made it quite a difficult feat for Capt. Cason to take in his hawser and bring the huge barges with freight cars upon their decks, along-side of the tug. After succeeding in thus handling the barges, and on approaching the wharves of the New York, Philadelphia & Norfolk Railroad Company, at Town point, at Norfolk, with the intention of temporarily leaving barge 40 there, and then proceeding with barge 1 to Berkeley, the passenger steamer Cape Charles, of the same company, which had just come in from across the bay heading southward, was seen vainly attempting to land, and much baffled in the effort by the extraordinary force of the wind and tide then prevailing. Capt. Cason, being himself under stress of wind and tide, deemed it impracticable and unsafe to attempt to land his own vessels then at Town point, and proceeded, looking out to port as he passed along the wharves of Norfolk for one at which to fetch up; his barges being on the port side of the tug. None were observed on the Norfolk side of the harbor, and he found it necessary to continue on to the railroad wharf at Berkeley, which was the destination of barge 1. There were a dredge and attendant mud-scows, a pile-driver and a small sail-vessel near the railroad wharf, which obstructed the approach to it; and he was under the necessity of heading for the coal-pier wharf further on, and south of the railroad wharf. He succeeded in nearing the coal pier, and getting out and making fast his lines to it. The Phillips, a stout steam-tug belonging to the Norfolk Southern Railroad Company, lay at the time in the slip between the two wharves just mentioned. This slip was too short for the admission of either barge 40 or barge 1. Meantime the passenger steamer Cape Charles had failed to effect a landing at Town point because of the force of wind and tide from the north in her rear, and had come on to Portsmouth, intending to land there first, and return to Town point, where she expected to effect a landing more easily when she should ap-

proach the wharf with bow to the wind and tide. This expectation was realized. Capt. Cason lay with his tug and barges at the Berkeley coal pier for nearly an hour, hoping for an abatement of the wind, which increased, rather than diminished, during the period. The night had become very dark, and there were squalls of rain. Fearing at length to lie longer there with both barges, he determined to leave barge 1, and return with barge 40 to Town point. His fear to hold both barges at the coal pier arose from the fact that the bottom near that pier had not then been dredged to its present depth, except immediately in front of the pier along a distance but half the length of his barges. He found that if one end of barge 1, which was next the pier, should ground, it would be impracticable to prevent barge 40, under the chafing that would ensue, from breaking loose; in which event there was danger of her being driven by the storm up the south branch, and drifting against the naval and other vessels that were anchored in that direction. He therefore determined to return with barge 40 to her original destination at Town point; leaving barge 1 where she was. In this design he turned his tug around, with bow to the wind and tide, heading towards Town point; and made fast to barge 40, his starboard to her starboard, and his bow towards her stern. It was important, in order to his effecting an easier landing at Town point that he should have his tow on his starboard, the wharf at which he was to land being on that side. The evidence shows, what reflection makes obvious, that it was impracticable to turn so long, bulky, and heavily loaded a vessel as the barge, in that place at that time, in the face of the wind and tide then prevailing, except at unwarrantable risk. The evidence also shows that it is customary in Norfolk harbor for large barges to be frequently towed stern foremost. The limited dimensions of the upper part of the harbor seem to render such a mode of towing a necessity of frequent recurrence in the navigation of this port. The barges of the New York, Philadelphia & Norfolk Railroad Company are built with bow and stern; but the usual method of building barges is with the two ends alike. Comparatively few of them are built with stern and bow; and it is shown in the evidence that those which are so built are towed, (when the tugs are along-side of them,) with as much facility when moving stern foremost as when moving bow foremost; and are even more manageable when thus moving, if circumstances allow the barge's rudder to be brought into play. It is only when towed with hawser that the form of bow and stern is important in barges. Capt. Cason knew the time-schedule on which the ferry-boat ran between Norfolk and Portsmouth. This boat, the Manhasset, whose owners are both libelants and respondents in this trial, left Norfolk then at 15 minutes before and 15 minutes after each hour; and left Portsmouth at each hour and half-hour when running at night. Several minutes before the departure of the Manhasset from Norfolk on the night of the 28th of March last, on her 15 minutes before 9 o'clock trip, Capt. Cason, with his tug to windward of barge 40, and in tow of her, the tug's stern nearly even with the hindmost end of the barge, or projecting not more than five or six feet beyond that end, pushed off from the coal pier at Berkeley,

and, after making an offing into mid-channel in the direction of the ferry slip, which was 233 yards distant across the channel, headed for Town point; having the barge stern foremost on his starboard side in tow. All the tug's lights were in their places and burning properly, namely, her colored side-lights, and her central range-lights, consisting of a white light on the stem in her bow, and two white lights, one above the other, at the usual elevation on a staff above the after-part of the deck. Although barges under tow are not required by any rule of the road or law of navigation to carry colored side-lights, and few of them ever have these lights, yet it had been the practice to carry side-lights on barge 40 similar to those required by law on sail-vessels. But, inasmuch as this barge was then moving stern foremost, her colored side-lights, which were in place and properly burning, did not, and from their structure could not, show forward in the direction in which the tug and barge were now moving. No light at all was shown on the barge to the front, except the white light of a large lantern that was placed on the end of one of the railroad cars nearest the foremost end of the barge as it moved.

On setting out from the coal pier Capt. Cason had left his mate, Richardson, at the wheel in the tug's pilot-house, and had himself taken position as lookout on top of a railroad car at the foremost end of the barge; whose master, Capt. Stokely, was on the bridge erected at an elevation above the tops of the cars adjoining the pilot-house in the aft part of the barge. Capt. Stokely had becketed the barge's helm in such manner that it could be instantly let loose and brought into use whenever occasion should require. Below Capt. Cason, and near him, on the foremost end of the barge as she was moving, a colored deckhand, Reed, was placed on the deck of the barge. The usual complement of crew were on the tug Portsmouth. Along the wharves of Portsmouth, from that of the Seaboard Railroad on to Robinson's, are powerful electric lights, erected by the owners of the wharves for the purpose of lighting up that part of the harbor. When the eyes are looking towards these lights in a dark night, intervening objects, and lights from oil lamps, are always more or less dimmed or obscured by the glare of the electric lights. After pulling out into the channel and getting his heavy barge, moving against wind and tide, under headway, and after passing the Portsmouth ferry slip, Capt. Cason headed for Town point, bearing more or less towards the Portsmouth shore to get the protection of its warehouses from the force of the wind. In passing the Portsmouth slip he crossed the usual pathway of the ferry-boat, and was proceeding on the west of it, in his course to Town point, at a speed of about two miles an hour, when he saw the green light of the Manhasset after she had come out from her Norfolk slip. He very soon afterwards saw both of the Manhasset's lights. Desiring her to pass to starboard, he blew two whistles, but received no reply. After half a minute he again blew two whistles, and then ordered his tug's engine first to reverse, and then to back with full power, which orders were obeyed, and thereby the headway of the tug and barge were checked up. The Manhasset had continued her course until she crossed the Berkeley flats, and until she had come within

20 yards of the barge and tug, when she blew one whistle, showed her red light, and shortly afterwards was in contact with the barge on its then north-western corner. Both Capt. Smith and Capt. Cason say in their protest made next day that the Manhasset was 20 yards off when she blew one whistle. The joiner's work of the cabin, forward of the port wheel of the Manhasset, was raked and destroyed by a gliding blow, the cabin itself was staved in; her port wheel was disabled, and besides other damages to the hurricane deck, a piece of timber from it was driven into one of the railroad cars on the barge in such a manner as to hang the ferry-boat and barge together until they became separated by the grounding of the barge and tug shortly afterwards, near Thomas' ways, which are south of the Berkeley coal pier. The master and pilot of the Manhasset, Capt. Smith, in his protest entered on the day after the collision, says, among other things: "All his lights were burning. The wind was due north, and the weather cloudy and very dark, blowing a strong gale. After crossing Berkeley flats, saw a bright light, and thought it was the stern light of the [tug] Phillips towing a barge; slowed his boat down immediately, so as to let her go by; gave one whistle; there being no response, stopped the engine, and immediately afterwards the steamer was struck by the barge. Just as she struck he saw the lights of the tug, which up to that time had been hidden from view by the intervening barge, which was loaded with cars."

The evidence shows that there was no lookout on the Manhasset, on this trip. It usually had two deckhands, but one of these had purposely remained on shore, and the other, after the boat had left the wharf, had gone into some room amidships, and stood by a stove. There was a deck-officer charged with police duty; but he had passed rapidly through the cabins when the boat had left the wharf, and then gone into a shelter having in it a stove. No person whatever, having duties to perform on this ferry-boat, was on its deck during this trip, except one man, Capt. Smith, and he was performing alone the duties of master and pilot in the pilot-house. The evidence further shows, on this latter point, that the bridge and pilot-house of the barge, which were at an elevation above the tops of the railroad cars, had probably prevented the towing lights of the tug Portsmouth on the flag-staff of her rear deck from being seen by the Manhasset. Before the time of the collision, the Manhasset had been moving under her usual power of steam in her engine which produced her customary speed of nine miles an hour. On the occasion under consideration this speed had been accelerated by the flood-tide on which she was moving, and by the "strong gale" of wind from the north, which was increasing her speed. A "gale of wind," according to the signal service classification, is one which blows at a minimum speed of 40 miles an hour. I stated above that a "high wind" was blowing, the minimum of which is 25 miles an hour. I think it is a reasonable estimate to suppose that the speed of the Manhasset in crossing from Norfolk on this occasion was accelerated at least by 3 miles an hour, and therefore that she was moving at the rate of 12 miles an hour.

The point at which the collision occurred is fixed by the evidence at the figure 26, marking that depth of water on the chart of the harbor, filed with the evidence, that is to say, at the number 26, which is on a direct line drawn from the end of the ferry slip at Berkeley to the Old Dominion wharf on the Portsmouth side. This point falls on the letter "R" in the word "Route" on the smaller chart of the harbor. The evidence shows this point to be three-fourths of the distance of 1,058 yards between the ends of the two slips of the Norfolk and Portsmouth ferry; or 763 yards from the Norfolk slip, and 265 yards from that of Portsmouth. At the rate of 12 miles an hour, the Manhasset had made this 793 yards in 2 minutes and 15 seconds, and, allowing her half a minute for clearing the slip and getting under headway, the Manhasset reached the point of collision in rather less than 3 minutes from the time of leaving her Norfolk wharf. But if she moved at the rate of only 9 miles an hour, than she moved 793 yards in 3 minutes, and reached the point of collision in $3\frac{1}{2}$ minutes after leaving her wharf. The time which the tug and barge had spent in reaching the point of collision after leaving the coal pier at Berkeley may be accurately ascertained in like manner. The point of collision being 265 yards from the Portsmouth ferry slip, and that slip being 233 yards from the coal pier, the aggregate of these distances is 498 yards, so that the distance traversed by the tug and barge on the curved line pursued could hardly have been less than 380 yards. The time required for moving over this distance at the rate of two miles an hour was six minutes and a half; and if we add one minute for the time necessary for leaving the coal pier and getting under headway, the time consumed in going from the pier to the point of collision was seven minutes and a half. It thus appears that the tug and barge left the coal pier in Berkeley four or four and a half minutes before the Manhasset left her wharf at Norfolk. It is for this reason that it has been stated above that the Portsmouth and barge 40 left the coal pier several minutes before the Manhasset left Norfolk, and had crossed the usual pathway of the ferry-boat when the latter boat came out of her Norfolk slip, and shortly afterwards showed her green light. The ship-yard and stocks of Thomas & Co. are south of the coal pier, on the Berkeley side of the South Branch, in the direction of the navy-yard. The protest of Capt. Cason, made on the day after the collision, after other recitals, proceeds: "The Manhasset in colliding was considerably damaged, and became unmanageable; tried to put her in at Thomas' ways, but [we] grounded before reaching the ways; not being able to manage the tug properly while both boats were foul, [meaning the Manhasset and barge 40,] and having also caught a log in her wheel. Between the Berkeley slip and Thomas' ways the tug grounded with the barge, and the Manhasset got clear of her. After getting clear, the tug went along-side of the Manhasset, took off the passengers, and landed them at the steam-boat wharf, [meaning the Seaboard wharf.]" In this narration, Capt. Cason omits to mention what the evidence taken supplies—that after he got loose from the Manhasset, she drifted south, up the river, and finally grounded. The Berkeley ferry-boat went after her,

to give relief, but failed in this purpose after coming in contact with one or more naval vessels anchored in the South Branch river. Capt. Cason, after getting clear of the Manhasset, the wind having greatly moderated, succeeded in depositing the barge at the Seaboard wharf; and, being now free of incumbrances, followed the Manhasset up the river, until he found her helpless and aground. Taking her in tow he brought her to Portsmouth, and succeeded in landing her passengers, and relieving them from the fears and dangers to which they had been subjected. Besides the injuries which the Manhasset had sustained in the collision the casualties of the occasion were very serious. Mrs. Cooper, the wife of one of the libelants here, who was sitting in the port cabin of the Manhasset, forward of the wheel, was killed outright. Damages for her loss have been sought by her husband in a common-law court. Cooper himself was seriously injured, and in one of the libels now under trial he demands damages for these personal injuries, and their consequences to himself. Mrs. Lilliston, wife of T. M. Lilliston, both of whom are libelants in one of the libels now under trial, was very painfully, dangerously, and well-nigh fatally, injured.

*Walke & Old* and *R. C. Marshall*, for libelants.

*J. F. Crocker* and *G. H. Gorman*, for the Manhasset.

*Sharp & Hughes*, for tug and barge.

HUGHES, J., (*after stating facts as above.*) There can be no doubt that the libelants that have been named are entitled to damages. If the ferry-boat was in fault they had contractual relations with it which justify damages for injuries. If the tug and barge were in fault, they are entitled to recover damages from them as for tort; and so I will first dispose of that part of the case before entering upon the question of fault. The case of Mrs. Lilliston is the most serious one. She was dangerously and painfully injured, though, fortunately, as has turned out, not permanently so. She suffered excruciating agonies for a series of many days. She was prostrated and helpless for months. Her injuries would doubtless have proved fatal, but for the skill of her physician, the recuperative energies of a strong constitution, and the careful and assiduous nursing of friends. I will sign a decree awarding her $2,500, and one in favor of her husband individually, for the amount of her medical bill, and for the sum of $200 besides. This latter amount is intended to cover loss of time from work, and miscellaneous expenses incidental to the illness of Mrs. Lilliston. I will sign a decree in favor of Cooper for $750, plus the amount of his medical bill,—the first sum to stand for loss of time and the expenses incident to his wounded condition.

I come now to pass upon the crucial question in this trial, namely, whose was the fault which caused the collision? The cause of the accident may be stated in a nutshell. That cause was the mistake made by Capt. Smith in supposing the white light which he saw before him was that of the tug Phillips moving from him, and in porting his helm in order to let it pass out of his way. Instead of that being the case, the light was upon a barge moving towards him when first seen, and moving in such

a manner that when he did make his tardy movement, that movement rendered the collision inevitable. If the light had been moving from him, his determination to pass under the stern of the supposed vessel was, no doubt, right enough; but the light being in fact on a vessel that was approaching him, his movement was an attempt to cross her bow when he was already upon her, and the collision was rendered an absolute certainty. Therefore, the real question to be considered is, through whose fault was it that Capt. Smith made the mistake that has been described? It may have been his; it may have been Capt. Cason's; it may have been the fault of both.

First, as to the Manhasset. She was moving, in that dark, rainy night, across a harbor navigated day and night by many vessels, at the rate of 9 to 12 miles an hour, before a strong wind and tide, without a lookout or a deckhand above decks to serve as eyes and ears, except the man at the wheel, who was acting, alone and singly, as master, pilot, wheelsman, and lookout, all in one. Moving, thus blind and deaf, with such force and rapidity, in a harbor, in the dark, loaded with passengers, with but one solitary man above decks, such was the condition in which she encountered disaster. There are cases in which *res ipsa loquitur*,—fault is self-proclaimed. In respect to lookouts, the law is positive and absolute. The decisions of the courts are replete with admonition of the necessity of the lookout as a *sine qua non* of safe navigation. It were vain to devise laws of navigation, or to agree upon rules of the road, if ships were not required to keep one or more lookouts constantly and properly posted during the time they are in motion. The specific duty of the lookout is constantly to search the horizon for objects that may affect the navigation of his ship, and to report the varying conditions the ship finds herself in in relation to other vessels in the same waters, in order that she may be navigated in obedience to the law or rule of navigation applicable to the conditions reported. The lookout's duty is distinct and different from that of the navigator. He is in a different position on deck. His mind and eye are differently occupied; his work and duty as different as that of one man can well be from the work and duty of another. The lookout of a ship is its eyes and ears; without him, she is blind and deaf. There is close and responsive relation between him and the pilot. His eye constantly and searchingly scans the face of the water before and on either bow of his ship and his voice is prompt to warn of every object that presents itself to the vision. The pilot's mind is intently upon the lookout, and his hand on the wheel intuitively responds to the lookout's voice. A lookout is only a lookout thus attracting the pilot's constant attention when he is regularly on duty. There is no such thing as an amateur or volunteer lookout. Such person has not the ear of the pilot, and his communications to him are little better than an impertinence and distraction. The real lookout and the pilot are essential counterparts of each other. In the absence of a pilot, the lookout's office is useless. In the absence of the lookout, the pilot is helpless, except to the extent that he subordinates his proper duty in order to act as lookout away from the lookout's proper position.

v.34F.no.5—27

Neither can do his own duty in the absence of the other; and without a pilot a steamer is a blind and deaf engine of mischief threatening every object in its pathway. I repeat that the language of the admiralty courts on the subject is clear, positive, and unqualified. It admits no double interpretation. The supreme court of the United States held in the case of *Newton* v. *Stebbins*, 10 How. 607, that a steamer was in fault in not having a proper lookout at the forward part of the vessel, there being no one but the man at the wheel on deck. The supreme court said in the case of *St. John* v. *Paine*, Id. 585:

"The steam-boat was in fault in not keeping on deck at the time a proper lookout on the forward part of the deck. The pilot-house, in the night, especially if dark, and the view obscured by clouds in the distance, was not the proper place, whether the windows were up or down. A competent and vigilant lookout stationed at the forward part of the vessel, and in a position best adapted to descry vessels approaching at the earliest moment, is indispensable to exempt the steam-boat from blame in case of accident in the night-time, while navigating waters on which it is a custom to meet other water craft."

The supreme court said in *The Genessee Chief*, 12 How. 463:

"It is the duty of every steam-boat traversing waters where sailing vessels are often met with, to have a trustworthy and constant lookout, besides the helmsman. It is impossible for him to steer the vessel, and keep a proper watch in his wheel-house. His position is unfavorable to it, and he cannot safely leave the wheel to give notice when it becomes necessary to check suddenly the speed of the boat. And whenever a collision happens with a sailing vessel, and it appears that there was no other lookout on board the steam-boat but the helmsman, or that such lookout was not placed in the proper place, or not actually and vigilantly employed in his duty, it must be regarded as *prima facie* evidence that it was occasioned by her fault."

The supreme court, in *The Catharine*, 17 How. 177, speaking of a lookout on a sail-vessel, said:

"Custom or usage cannot be permitted as an excuse for dispensing with a proper lookout while navigating in the night, especially on waters frequented by other vessels. Under such circumstances, a competent lookout, stationed upon a quarter of the vessel affording the best opportunity to see at a distance those meeting her, is indispensable to safe navigation, and the neglect is chargeable as a fault in the navigation."

The supreme court said, in *Chamberlain* v. *Ward*, 21 How. 570:

"Steamers navigating in the thoroughfares of commerce must have constant and vigilant lookouts stationed in proper places on the vessel, and charged with the duty for which lookouts are required, and they must be actually employed in the performance of the duty to which they are assigned. To constitute a compliance with the requirements of law, they must be persons of suitable experience, properly stationed on the vessel, and actually and vigilantly employed in the performance of their duty; and for a failure in either of those particulars, the vessel and her owners are responsible."

The supreme court, in *Haney* v. *Packet Co.*, 23 How. 292, used this language:

"The captain of a steamer, whose theory of action appears from his own testimony to be that all small vessels are bound at their peril to get out of the way of a large steamer carrying the United States mail, although he had seen

the schooner, and knew that the vessels were approximating at the rate of twenty miles an hour, retired to his cabin. He left on deck one man, besides a colored man at the wheel, to act as pilot, lookout, and officer of the deck. These two persons constituted the whole crew on duty, besides firemen and engineers. This person who had to perform these treble functions was the second mate. His theory is that the best place for a lookout is in the pilot-house, where, he says, 'I generally lean out of the window, and have an unobstructed view.' Accordingly as pilot he remained in the pilot-house, to direct the steersman; and, as lookout, he occasionally leaned out of the window."

After speaking thus derisively of master and second mate, and after repeating the law of the duty of lookouts, the supreme court held that it was "the captain's duty to have been on deck, which he was not; and that the only man on deck, acting as pilot, lookout, and officer of the deck, was not in the proper place for a lookout to be when he was in the pilot-house." The supreme court in the case of *The Ottawa*, 3 Wall. 268, held that "lookouts must be persons of suitable experience, properly stationed on the vessel, and actually and vigilantly employed in the performance of their duty; and that the master of a steamer, when acting as officer of the deck, and having charge of the navigation of the vessel, is not a proper lookout, nor is the helmsman." The circuit court of the Northern district of New York, in *The Northern Indiana*, 3 Blatchf. 92, held that in a steamer running along a track frequented by sail-vessels, the inside of a pilot-house in a dark night is not the proper position for a lookout. Adopting the rulings of the English high court of admiralty, Mr. Justice NELSON held that "the want of a lookout, detailed and stationed for that specific duty, is in itself a circumstance of a strong condemnatory character, and exacts in all cases from the vessel neglecting it, clear and satisfactory proof that the misfortune encountered was in no way attributable to her misconduct in that particular." In none of the decisions of the courts enforcing the duty of having competent and vigilant lookouts properly stationed on steamers while in motion, is any exception made or implied in favor of ferry-boats. The circuit court of the United States for the Southern district of New York, in the case of *The America*, 10 Blatchf. 159, held that "in the navigation across the crowded channel of the East river at New York a most vigilant lookout from some place on the ferry-boat is required." The district court of the Southern district of New York, in the case of *The Monticello*, 15 Fed. Rep. 474, held that a ferry-boat was liable for a collision which occurred about 140 feet outside of her slip, where she started without a lookout upon her bows. The district court of New Jersey, in the case of *The Ant*, 10 Fed. Rep. 294, held that steamers navigating on the thoroughfares of commerce are bound to have a lookout, independently of the helmsman. English and other American authorities on the subject might be multiplied indefinitely, if it were necessary. It is safe to say that no rule of navigation is more thoroughly established than that which requires every moving vessel to have a lookout, specifically charged with the duties of lookout, and none other, and to have him properly stationed. There can be no rules for the government of ferryboats varying from those prescribed for shipping in general. The laws

of navigation are universal, and are binding on all water craft. Ferry-boats usually ply in harbors, and the existence of different rules of navigation for different vessels in the same harbor would be fruitful of calamity. There was once a provincial notion that vessels carrying the United States mails were entitled to the right of way; but it has been scoffed out of the code of navigation. The idea that a ferry-boat has an exclusive right of way in a harbor, and is exempt from the conventional canons of navigation obtaining all the world over, is a provincialism unworthy of an enlightened age, and pregnant with disaster to life and property. There would be no use for settled and universal canons of navigation, if vessels were not required to have competent lookouts, properly stationed, whenever they were in motion. Rules would be a dead letter, and unsusceptible of application, if there were no lookouts. They are the key to the whole code of navigation. The Manhasset was fearfully in fault in having no lookout on the unfortunate trip which we are considering. Who can say that, if she had had a special and vigilant lookout when she emerged from her Norfolk slip, charged with the special duty of closely and timely scanning the whole harbor from the outset, he would not have discovered Capt. Cason's barge's light in the distance, and narrowly studied it from the moment of first seeing it? Could such a lookout, intent upon the special duty of interpreting such a problem, have supposed that a light which was approaching him steadily for two and a half or three minutes, was a light on the stern of a receding vessel, brightening as it receded? Is it possible that his ears set for the reception of sounds could have failed to hear two loud, coarse whistles sounded and afterwards repeated, which were heard by as many as three passengers on his boat, and were heard all around the harbor by every man whose business led him to expect the tug which gave them, and whose attention was·on the alert in regard to them? I am firmly persuaded that if there had been a special, experienced, vigilant lookout on the Manhasset on the night in question, proper attention would have been given in time to the light of the barge, and proper response made to the double whistles repeated, which were sounded by the tug. I am persuaded that Capt. Smith's mistake in supposing an approaching light was a receding one, and the consequent collision, was due to the want of a keen-sighted and sharp-eared lookout on the Manhasset. The Manhasset was in fault in respect to the lookout, and is responsible for the collision, unless it can be shown that the tug and barge were also in fault, and by their fault contributed to the accident. I come, therefore, to deal with this *tu quoque* plea.

The principal complaint against the tug and barge is in regard to their lights. As to the tug, the charge is that, although she may have had the regulation lights in their places, and burning, yet she took a position beside the barge which prevented them from being seen by the ferry-boat. The law, in rules 3 and 4 of navigation, not only defines the number and kind of lights to be carried by a steamer in towing another vessel, but fixes with precision the places at which these lights are to be carried. Its requirements were complied with by the tug. The same law forbids

the carrying of any other signal-lights than those designated, and, in doing so, forbids by necessary implication any change in the position of the lights it provides for. The tug, therefore, had no right to elevate her lights above their legal position, and, if she had done so, her lights would have been misleading, false, and unconventional. Therefore the objection to the manner in which the tug carried her lights resolves itself into an objection to her taking position on the west side of the barge, where the ferry-boat could not see them, and not on the east side, where that boat could have seen them. But the tug had sufficient reason for placing herself to leeward of the barge. The wharf to which she was towing the barge was on the side on which she placed it; and the tug was exclusive judge of the position she should occupy towards the barge. Her lights were visible to all the vessels she would pass lying on her port side; all the vessels which might be at the Portsmouth wharves; all that might be at anchor on the Portsmouth flats; all that she might pass or meet on her port side, coming in from or going out to the lower harbor. To say that she should have ignored all this shipping, and, at great inconvenience, changed sides with her barge, and crossed over to Town point in a manner to make it difficult to land the barge at that wharf, is virtually to say that she should have navigated the harbor, not with reference to other shipping, but exclusively with reference to the ferry-boat; not with reference to the facility of effecting the landing which she had in contemplation, but solely with reference to meeting the ferry-boat. Such a contention is only another fruit of the theory that the ferry-boat has some special rights and importance in the harbor superior in dignity to those which attach to other vessels. I cannot recognize such pretension. There was no obligation upon the tug to place herself on the east side of the barge in order that her lights might be visible to the Manhasset, rather than to all the vessels she might pass on her Portsmouth side. She was not in fault in the fact of her lights being on the side of the barge where the Manhasset could not see them. The case of *Chamberlain* v. *Ward*, 21 How. 564, is not in point. The court held there, simply, that the lights of a vessel must be kept trimmed and replenished with oil, and not permitted to grow dim and go out by midnight.

It is complained, as to the barge, that her side-lights were visible only from her wake and were invisible from the direction towards which she was moving. This was not fault. There is no law of navigation requiring side-lights to be carried on barges under tow, and the side-lights of this barge, on the night under consideration, were, to all vessels ahead of her, as no lights at all. As to white lights, the navigator of the barge had no right to improvise a set of lights to serve the purposes of that particular occasion. No signal-lights are of value, and I might add, of legality, in navigation, except the conventional lights known and understood of all mariners, prescribed by law and the rules of the road. The barge had a right to move stern foremost, especially under the necessities which then required it; and one thing only was legitimate for her to do, in moving in that manner, which was to display one white light in a

manner not to be mistaken for any regulation light, and so placed as to warn all comers that it marked an object on the water. A plain white light, whether on land or on water, whether on a street or a country road, in an anchorage, or in a channel of navigation, means always, "Take care, for there is something here you must not run against!" Its purpose and universal effect is to put every comer on inquiry. That was the meaning of the single white light on the barge. It was visible to the Manhasset; and if she had had eyes on the outlook, vigilant eyes searching the harbor in the calm moments of the beginning of her voyage; experienced, expert eyes to peer into the darkness, and wrest from it its inconspicuous as well as its conspicuous objects,—that single white light would have been seen and understood; and the lookout would have been cautioned by it, and put upon inquiry, and would have discovered that it was approaching him; and Capt. Smith would have been prevented from mistaking it for the stern-light of a familiar tug going off into the railroad slip at Berkeley. It was not fault in the barge to have displayed this light. Nor was it fault in her to have had no other visible lights upon her. The laws of navigation, by an omission that ought to be supplied, fails to require other lights on barges under tow; and if others had been displayed, they would have been anomalous, unintelligible to navigators, misleading, and probably illegal.

Much stress of objection is laid upon the fact that Capt. Cason knew the night schedule of the Manhasset, and that she would be on her passage to Portsmouth before he could get away from her route. I attach no importance, in this connection, to the fact, arithmetically shown, that he left the wharf of the coal pier four minutes or more before the Manhasset embarked from Norfolk. Vessels having occasion to move in this harbor are under no obligation of either morals or law to delay their departures until a ferry-boat shall have made a trip. The harbor is free to all, and the laws of navigation are as democratic as cosmopolitan. They recognize no privileged characters, and stand upon the catholic principle of equal rights and common duties. The barge and tug of the respondents here had the absolute choice of the time of setting out on their trip to Town point, and the unqualified right to choose it at their own will. If the vessels having the right to navigate this harbor were bound to stay five minutes for the ferry-boat to cross it in one direction, and five minutes also to cross in the other during every 20 minutes of the day, they would have but half the time to move in; and if another boat were added to the ferry service, the upper part of Norfolk harbor would be closed to general navigation. This pretension thus resolves itself into an absurdity; and cannot be countenanced. But it is claimed that, though the right to move at will might have belonged to the tug, yet prudence should have counseled delay for the passage of the ferry-boat in view of the danger of encountering her; and that venturing out at that particular time was fault in the tug and barge. If my duty calls me into a public street, where a strong man claims special occupancy, discretion or cowardice might dissuade me from venturing forth; but if, exercising my right, I do go into the street, and the strong man assaults

me and gets hurt, surely the fact of my being on that street is not to be deemed the fault of the occasion. Surely the prudential argument is untenable. Besides, why should the ferry-boat alone be given the wide berth? The only possible answer is, that she alone of the vessels of the harbor is likely to run into vessels crossing her pathway, and is the most dangerous one to encounter. Such a pretension is not flattering to the reputation or the character of a ferry-boat, and may be dismissed for that reason alone.

It is urged that the tug and barge were in fault in having disregarded rule 19 of navigation. That rule declares that "if two vessels under steam are crossing so as to involve risk of collision, the vessel which has the other on her own starboard side shall keep out of the way of the other." The rule applies to vessels that are on courses which cross each other. The tug left the Berkeley coal pier about four minutes before the Manhasset left Norfolk. She had less than 233 yards to go before crossing the usual route pursued by the Manhasset in coming into her Portsmouth slip. The ferry slip was 233 yards from the coal pier. The tug and barge, as I have already estimated, did not approach within 100 yards of the slip. She had, therefore, but 133 yards to move from the coal pier before crossing the route of the ferry-boat. At the rate of two miles an hour, she made these 133 yards in two minutes five seconds after getting under way from the coal pier, and allowing one minute and a half for getting under way, then the tug and barge had crossed the route of the ferry-boat in three minutes and thirty-five seconds after leaving the coal pier, and fully one minute before the Manhasset had left her Norfolk slip. The case is therefore not one of crossing courses, and rule 19 has no application. The tug and Manhasset, after the latter left Norfolk, were pursuing courses that did not cross, and that involved no danger of collision, if each vessel held its course, and neither adopted any eccentric movement. They were on courses that naturally required each vessel to leave the other on its own starboard; in other words, to pass to the left. And accordingly, as soon as Capt. Cason saw both lights of the Manhasset, he blew two whistles, and half a minute afterwards blew two more, admonishing the Manhasset that he proposed to pass to the left. He received no response from the Manhasset, until the two vessels were within 20 yards of each other, approaching at the rate of 11 to 14 miles an hour; that is to say, were within 3 to 5 seconds of collision.

It is also urged that Capt. Cason did not obey the requirements of rule 3 of pilot regulations, which provides that "if, when steamers are approaching each other, the pilot of either vessel fails to understand the course or intention of the other, whether from signals being given or answered erroneously, or from other causes, the pilot so in doubt shall immediately signify the same by giving several short blasts of the steam-whistle; and if the vessels shall have approached within half a mile of each other," etc. It is complained that Capt. Cason did not give these alarm blasts. The rule applies to vessels which are far enough distant from each other for such blasts to avail when the pilot who first signaled discovers that the other has misunderstood him, or proposes some other movement. In

the present instance, Capt. Cason was not informed by the whistle of the Manhasset that she rejected his signal to pass to the left, and substituted a movement to the right, until the two vessels were within 20 yards, or 5 seconds, of each other; and the rule did not admit of compliance. The case came within navigation rule 24, which admits a departure from all rules in moments of immediate danger. *Lex non cogit ad impossibilia.* Not only with reference to pilot rule 3, quoted above, but to navigation rule 19, previously quoted, it is to be considered that the tug and barge were moving against wind and tide,—a mammoth barge, heavily loaded, in tow of a tug, in sore stress of water and weather; while the ferry-boat was moving free before both wind and tide, in perfect command of helm, side-wheels, and course. When vessels are in such relative conditions, a court of admiralty will not be exacting in regard to mere technical shortcomings on the part of a vessel moving with heavy incumbrances, even though they were apparent; as they are not in this case. I do not discover fault in the management of the tug and barge after they had crossed the usual route of the ferry off her Portsmouth slip, and had got under way for Town point.

It remains for me only to notice, in closing this discussion, the contention of proctors for the Manhasset, that the absence of a lookout on their boat was immaterial in this case, because the collision was not due to such absence; inasmuch as he could not have seen the lights or heard the whistles of the tug, though he had been in place. In answer I have to say that there were at least three persons on the Manhasset, one of whom both saw the light on the barge and heard the four signal whistles, and all three of whom heard the whistles. The witness who saw the light seems to me to have established his claim to credit with exceptional strength. Under a severe cross-examination in an uncharitable direction, he told truths extremely disagreeable to himself in a very manly manner; and we have a right to conclude that if a witness will adhere to truth under such an ordeal in matters of deep personal interest to himself, he may be believed implicitly, when testifying to facts which he has no interest in concealing. The proof is positive that whistles were blown, and the white light shown; and the necessary inference is that if the Manhasset had had a vigilant lookout properly stationed, he would have heard and seen, and the collision thereby avoided. I therefore, on the whole case, find that the tug and barge were without fault, and that the Manhasset was solely in fault, in not having had a lookout properly stationed, who would have so informed Capt. Smith of the barge's light and the tug's whistles, that he would not have made the mistake of crossing the tug's bow at the critical moment of the occasion. I will decree in accordance with this finding. It will have been observed that I do not object in what has been said to the speed at which the Manhasset was running. It is doubtless true that 12 miles an hour is too rapid a speed for a steamer in a crowded harbor; but I do not think that 9 miles is necessarily too great. The excess of speed on this occasion was due wholly to the wind and tide; and I do not think, when the usual speed of a vessel is thus accelerated,

that the fact calls for animadversion from an admiralty court. That speed, thus produced, is not itself criticised in the present discussion, except so far as it aggravates the negligence of the want of a lookout. No steam vessel ought to move in any navigated water fast enough even to give her steerage-way, without a lookout, who is its eyes and ears. It is the absence of a lookout that was the presumptive cause of this collision, and I have treated the rapid speed of the ferry-boat only as an aggravation of that cardinal fault.