### THE MARY POWELL.

(Circuit Court of Appeals, Second Circuit. January 25, 1899.)

#### No. 42.

COLLISION—CROSSING STEAMERS—DUTY TO REVERSE.
    A steamer, when the privileged vessel, in crossing, is not required to reverse to avoid a collision until it becomes evident that the other vessel will not or cannot keep out of the way.[1]

Appeal from the District Court of the United States for the Southern District of New York.

This was a libel by William H. H. Curtis, as master, etc., against the steamboat Mary Powell, for collision. The libel was dismissed by the district court.

[1] For signification of signals of meeting vessels, see note to The New York, 30 C. C. A. 630.

The following is the opinion of the court below (BROWN, District Judge):

"There can be no doubt of the extreme negligence and carelessness of the man in charge of the naphtha launch. Crossing the North river off Thirty-Fifth street, where large steamers are in the habit of passing, he sat on the side of his boat facing down river, and manifestly gave no attention to any large vessels that might be coming down from above. To the repeated whistles of the Powell he gave no heed, and he was not aware of her near presence until she was within about 50 feet of him, when he was startled by the shouts of the captain from the steamer's bows. The launch, only about 30 feet long, was going probably about 5 miles an hour, and could be turned in a length or two. Whatever might be the faults of the steamer, it is almost impossible that such a launch could be run down, without gross inattention and carelessness on her part.

"If, however, the Powell was an overtaking vessel, and as such bound by the rules of navigation to keep out of the way of the little launch, I should be obliged to find the steamer also to blame; because it is plain that she did not take timely and efficient measures to keep out of the launch's way. She considered and treated the launch from the first as a crossing vessel, that, having the steamer on her own starboard hand, was bound to keep out of the way of the steamer in accordance with the ordinary rule. The chief controversy in the case has been whether the situations of the two boats were such as to make them crossing vessels within the meaning of the rules of navigation, or such as to make the Powell an overtaking vessel, as claimed in behalf of the libelant.

"In the case of The Aurania, 29 Fed. 98, it was held that a vessel coming up from a position more than two points abaft the beam of a vessel ahead of her, should be treated as an overtaking vessel, and not as a crossing vessel. This construction had been previously adopted in the English case of The Franconia, 2 Prob. Div. 8, and it has now been embodied in article 24 of the new rules of navigation which went into effect the 1st of July, 1897. In the latter rule it is further provided that in case of doubt, in the daytime, the steamer astern should assume that she is an overtaking vessel and keep out of the way.

"The present case illustrates forcibly the great difficulty that attends the application of this rule in the daytime, upon contradictory testimony as to the positions and courses of the two vessels. There are here four different elements, each in dispute, a change in any one of which would affect the determination whether the Powell was an overtaking or a crossing vessel: (1) the distance of the launch from the dock when first seen; (2) the amount of the launch's heading down river; (3) the distance of the Powell from the New York shore, whether 300 or 500 yards; (4) the distance of the Powell above the launch at the time when the launch was first seen, or when the Powell ought to have noticed her, and begun to maneuver with reference to her.

"According to the testimony of the Powell, the launch was first seen about 200 feet off the piers at Thirty-Fourth or Thirty-Fifth street, heading, as it appeared to her officers, nearly straight across the river. That would make her a crossing vessel bound to keep out of the way of the Powell. The Powell was then off Fortieth or Forty-First street, heading nearly straight down river and going with the ebb tide at a speed of about 18 miles an hour; and in my judgment upon the whole testimony, she was then about 400 yards from the New York shore. Though the launch was then not over 600 yards further down river, it is not claimed that the Powell was in fault for not observing her sooner; nor would inferences be drawn as to the intended course of the launch, if she had been seen less than 200 feet outside of the piers.

"The launch belonged to the yacht Nourmahal, which was at anchor not far from the Jersey shore, abreast of the long dock a little above the Erie Railroad oil depot, and the launch was intending to return to her. The direction of the Nourmahal from a point 200 feet off from the docks at Thirty-Fourth or Thirty-Fifth street was about three points to port of a line drawn

straight across the river. If the launch was headed from that point straight for the Nourmahal, the Powell, if only 825 feet distant from the New York docks, the nearest distance claimed for her by the libelant, would be within the range of the launch's green light by three-quarters of a point, and would therefore be at that time in the position of a crossing vessel. If the Powell was further from the New York shore and as I judge from all the testimony about 400 yards off shore, she would have been nearly two points forward of the aft range of the launch's green light.

"For the libelant, however, it is contended upon the testimony of the launch-man, that the heading of the launch was kept all the time a point below the yacht. The tide was strong ebb, which runs there about 2½ knots an hour. In the ordinary practice of boatmen, if no circumstances called for a roundabout course, the heading of the launch, intending to make the yacht, would have been at least a point above her, instead of a point below. The launch-man said he headed thus because the water was rough, to get an easier crossing and thus to avoid the spilling of acid from the launch's batteries. The respondent contends that the river was not rough, nor in any such condition as to call for such precautions. If headed at first a point below the yacht in such a tide, a constant port helm would have been required, and a constantly changing direction of the launch to starboard in a curvilinear course would have been necessary in order to prevent the launch from falling far astern of the yacht she was aiming at. If the launch had started from Thirty-Fifth street heading a point below the yacht, by the time she was 500 feet out, in order to preserve that heading, she would have been obliged to be hauled about one-half a point to starboard; and when 200 or 500 feet out, if the Powell was 1,000 feet or upwards from shore as I have no doubt she was, she would still have been, according to my measurements of the angles, within the range of the launch's green light at night, and therefore a crossing vessel. It is not necessary, therefore, to discuss the credit to be given to the different witnesses who have testified directly as to the apparent course of the launch, nor the reasons assigned by the launchman for heading a point astern of the yacht, rather than a point ahead of her. The testimony as to the heading of the launch by witnesses outside of the Powell is mostly by those who had no call to observe her heading accurately, and who were not in a position to do so. There is no doubt that the launch was heading somewhat down the river at first, and afterwards drew more to the westward as she would naturally do even if her heading was at first directly for the yacht and not below it. But taking the Powell as at least 1,100 or 1,200 feet from the New York docks, the launch at all times after she was 200 feet out was, as I make the courses, a crossing vessel.

"I do not find that the speed of the two vessels creates any difficulty in the above findings. The collision occurred off Thirtieth or Thirty-First street. The Powell, therefore, traversed about 2,600 feet. The estimates of time and distance testified to are as usual, very inaccurate. But to enable the launch to get abreast of Thirtieth or Thirty-First street at collision, on the heading she had, and going at a 5 knot speed with the tide 2½ knots, the interval must have been very nearly two minutes, which would give the Powell an average speed of 13 or 14 knots in going 2,600 feet. At Fortieth street she signaled and slowed, and when about 300 feet from the launch, she stopped her engines. From her light draft, powerful engines and broad paddles, she is handled comparatively quickly; and the behavior of ocean steamers furnishes no analogy. The circumstances of the collision and the launchman's saving himself by clinging to one of the steamer's guard braces make a speed of 7 to 9 knots at collision most probable, and this speed is sufficiently in accord with the previous findings.

"The order to reverse was given, but countermanded to avoid causing loss of life from the revolving paddles. Ordinarily the Powell would be held in fault for not reversing sooner. But against the privileged vessel, this rule is applied only when it becomes evident that the other vessel cannot or will not keep out of the way. Here the launch was a small craft, capable of such quick handling that the officers of the Powell had a right to rely on her keeping out of the way down to a time so near collision that it was then impossible for a steamer like the Powell, so much larger, to avoid collision.

I cannot find, therefore, any blame to attach to the Powell, and the libel must therefore be dismissed with costs."

E. L. Baylies, for appellant.

R. D. Benedict, for appellee.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

PER CURIAM. Decree affirmed, with costs, upon opinion of the court below.