## THE HAVEN BELLE.

## THE SEMINOLE.

## HUDGINS v. GATEWOOD et al.
## No. 4032.

Circuit Court of Appeals, Fourth Circuit.

Oct. 6, 1936.

R. Arthur Jett and D. Arthur Kelsey, both of Norfolk, Va. (Kelsey & Jett, of Norfolk, Va., on the brief), for appellant.

Leon T. Seawell, of Norfolk, Va., for appellees.

Before PARKER and NORTHCOTT, Circuit Judges, and CHESNUT, District Judge.

PARKER, Circuit Judge.

This is an appeal by the owner of the motor vessel Haven Belle, which on October 27, 1934, was in collision with the motor vessel Seminole in the James River off the coal piers at Newport News, Va. Libels were filed by the owners of each of the vessels against the other, and these were duly consolidated in the court below. From a decree holding the Haven Belle solely in fault and awarding damages of $2,800 to the owners of the Seminole, this appeal is prosecuted.

The Haven Belle is a tanker 118.1 feet long, 23.2 feet beam and 7.8 feet deep, of 184 tons burden. At the time of the collision she was partly loaded with 50,000 gallons of gasoline and was proceeding down the James River bound for Hampton, Va. The Seminole is a freighter 105 feet long, 27.1 feet beam and 8 feet deep, of 292 tons burden. She was proceeding up the river bound for Richmond. The collision occurred shortly after 8 o'clock p. m. The night was dark and the wind was blowing a gale of about 40 miles an hour, from the northwest. The tide had just changed to flood, and the water was rough. The speed of the Haven Belle was approximately nine miles per hour and that of the Seminole seven. Both vessels had proper lights burning and lookouts properly stationed.

The contention of the Haven Belle is that shortly after she passed through the James River bridge and was approaching the C. & O. Piers at Newport News she saw the steamer Delaware River back out into the channel from Pier 6 or 8 and proceed down the channel about half a mile ahead of her; that she followed in the path of the Delaware River about in the center of the channel and with the coal piers about 300 feet to her port, shifting her course to south southeast as she passed Pier 8; that, about a quarter or a half a

mile south of Pier 9, she observed the lights of a vessel, which later proved to be the Seminole, about 300 or 350 yards distant and about four or five points on her starboard bow; that she saw all of the lights of the Seminole, but that the green light was showing stronger than the red; that she considered it impossible to negotiate a port to port passage and immediately blew two blasts of her whistle and swung a little to port; that, receiving no reply from the Seminole, and observing that the lights of that vessel continued to bear on her, after proceeding about 150 yards she blew attention signals; and that receiving no reply to these, she proceeded at full speed in an attempt to clear the Seminole, but was struck about 8 feet from her stern by the stem of that vessel.

The contention of the Seminole is that, having left the Army Base at Norfolk about 7:30 p. m., she was approaching Newport News when she saw the Delaware River back out of the coal pier and proceed down stream; that she received a signal from the Delaware River for a starboard to starboard passage which she accepted, veering slightly to port for that purpose; that shortly thereafter she saw the green light and white stern light of the Haven Belle about 500 yards distant and two points on her port bow; that she heard a signal of one blast of the whistle from the Haven Belle which she answered with one blast; that she thereupon continued on her course until, when about 100 yards distant from the Haven Belle, she observed that the latter vessel was not altering her course; that she then blew three blasts of her whistle and reversed her engines; and that she had almost stopped when the collision occurred, her stem being twisted about 90 degrees to starboard as a result of this fact and of the speed of the Haven Belle at the time of the collision.

The testimony of the masters and crews of both vessels involved in the collision was taken orally in the court below, the only deposition offered being that of the master of the Delaware River; and the learned trial judge, who is thoroughly familiar with the waters in question, thus had the advantage of seeing and hearing the witnesses whose credibility and seamanship were in issue before him. His findings are therefore entitled to great weight and should not be disturbed unless

clearly wrong. Lewis v. Jones (The Amoy) (C.C.A.4th) 27 F.(2d) 72. He found that the Haven Belle had changed her course for the purpose of proceeding to her destination at Hampton and was crossing the bow of the Seminole with that vessel on her starboard quarter and was in fault in failing to keep out of her way. He absolved the Seminole of fault on the ground that, as a result of weather conditions, she misunderstood the signal given her as being one blast, calling for a port to port passage, and that, when she understood that the Haven Belle was crossing her bow, she did all that she could to avoid the collision.

A careful study of the record in the light of the arguments and briefs of counsel convinces us that the conclusion of the District Judge as to the cause of the collision is correct. Unquestionably the vessels were approaching each other on crossing courses. The master of the Haven Belle so testifies (R.30). He has filed with the court a diagram showing the relative courses of the vessels; and from this it appears that their courses crossed each other at an angle of approximately 53 degrees. A diagram filed by the master of the Seminole shows the same angle of crossing. It is clear, therefore, that one of the vessels must have been going across the channel at a decided angle if the other was proceeding with the channel; and there are two things that show that this must have been the Haven Belle: In the first place, she is placed by the master of the Delaware River as a half a mile distant from Pier 6, bearing approximately west by north quarter north, when the Delaware River backed out of that pier. (See Anderson Ex. 2). This would place her well out in the channel, a quarter of a mile or more from the coal piers on the eastern side. The evidence establishes pretty conclusively that she was only three or four hundred feet from the piers at the time of the collision (R.100); and this shows that she must in the meantime have come over to the eastern side of the channel. In the second place, the Delaware River, proceeding down the eastern side of the channel, 200 or 300 feet off the coal piers (R.25, 99), had passed the Seminole starboard to starboard at a distance of only 50 to 100 yards. (The captain of the Delaware River fixed the distance at 200 feet.) There would be no occasion, therefore, for that vessel to be going across the channel at

such an angle. These circumstances, together with those adverted to by the judge below, i. e., the destinations of the two vessels, the courses they would reasonably take, and the fact that the Haven Belle at all times showed her green and not her red light to the Seminole, indicate pretty clearly that it was the Haven Belle and not the Seminole which was crossing the channel.

But the crossing courses being established, as they unquestionably are, it would make no difference if the fact were, as contended by counsel for the Haven Belle, that the Seminole were the one whose course was across the channel. The Haven Belle did not know that the Seminole was bound for Richmond and that her course was up the river. All that she knew was that a vessel was approaching four or five points off her starboard bow and only 350 to 500 yards distant. Captain Hudgins of the Haven Belle said that the Seminole was headed for Pier 9 when he saw her (R.36); and, for all that he knew, she might have been crossing the channel to go to that pier. The situation was one of danger, for the speed which the vessels were making would bring them together in approximately a minute of time. As the Haven Belle had the Seminole on her starboard bow, her duty to change her course and speed to avoid the collision was clear. Inland Rules, art. 19. And there is little question that the proper maneuver under the circumstances was to steer her course to starboard and pass under the stern of the Seminole. Instead of doing this, she veered to port in an attempt "to get away from" the Seminole, and we think it clear that she was in fault in thus attempting to cross the course of that vessel. Knight's Modern Seamanship (8th Ed.) pp. 447–452.

The testimony on the part of the Haven Belle leaves considerable doubt as to whether she was within a few hundred feet of the coal piers or in mid-channel when she sighted the Seminole. As the vessels were on crossing courses and the Haven Belle had the burden of keeping out of the way of the Seminole, we do not think that this location is of controlling importance; but, if the Haven Belle was in mid-channel proceeding down stream as she contends, there would have been no difficulty in her negotiating a port to port passage with the Seminole as required by Inland Rule, article 18, for the Seminole could not have been far from midstream,

if the uncontradicted testimony as to the distance at which she passed the Delaware River is to be believed. If, however, it be assumed that the Haven Belle was near the coal piers, she was in fault in being on the wrong side of the channel. Whatever view be taken of the case, it is perfectly clear, not only that the collision could not have occurred, but also that not even a dangerous situation could have been created, if the Haven Belle had stayed on her proper side of the channel and obeyed the passing rules. Had she done this, no danger from the crossing of the courses of the two vessels could have arisen.

And we agree with the judge below that fault is not to be imputed to the Seminole. The rule is well settled that "the burden rests upon a vessel guilty of a major fault in navigation," as was the Haven Belle here, "to establish by clear and convincing evidence that faults in the management of another vessel in collision contributed to the result, and that doubts regarding the management of the other vessel should be resolved in her favor." Williams v. Norfolk, Baltimore & Carolina Line (C.C.A.4th) 85 F.(2d) 935 (this day decided); The Victory (The Plymothian), 168 U.S. 410, 422, 423, 18 S.Ct. 149, 42 L. Ed. 519. In view of the weather conditions prevailing we think that no fault is to be imputed to the Seminole in misunderstanding the signal given; and her master had no other reason to think that the Haven Belle would attempt to cross her bow. As soon as he discovered that this dangerous maneuver was being attempted, he reversed his engines, starboarded his helm, and did everything possible to avert the collision. "A steamer, when the privileged vessel, in crossing, is not required to reverse to avoid a collision until it becomes evident that the other vessel will not or cannot keep out of the way." The Mary Powell (C.C.A.2d) 92 F. 408.

Alleged faults of the Seminole in not having proper lights or a proper lookout do not merit discussion. The captain of the Delaware River testifies that he had no difficulty in seeing her lights a mile and a half away. The testimony on the part of the Seminole shows that a proper lookout was kept; and the only evidence from which a contrary conclusion could be drawn is that the passing signal of the Haven Belle was misunderstood. The court below finds, however, that this misunder-

942

standing was due to weather conditions prevailing instead of to inattention, and we see no reason to disturb that finding.

For the reasons stated, the decree appealed from will be affirmed.

Affirmed.