## THE BRIGHT.

## THE HAWAIIAN.

## THE SAMSON.

## AMERICAN HAWAIIAN S. S. CO. v. MERRIAM et al.

### No. 4850.

Circuit Court of Appeals, Fourth Circuit.

Dec. 16, 1941.

Eugene F. Gilligan, of New York City (Kirlin, Campbell, Hickox, Keating & Mc-Grann, of New York City, Ritchie, Janney, Ober & Williams, of Baltimore, Md., W. H. McGrann, of New York City, and Robert W. Williams, of Baltimore, Md., on the brief), for appellant.

George W. P. Whip, of Baltimore, Md. (Silas Jacobson, of Portland, Me., on the brief), for appellee Lloyd W. Merriam, Master.

Christopher E. Heckman, of New York City (Foley & Martin, of New York City, John H. Skeen, of Baltimore, Md., and James A. Martin, of New York City, on the brief), for appellees claimant of the steamtug Samson and Eastern Transp. Co.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This is an appeal from a decree entered in the United States District Court for

the District of Maryland, in a libel in admiralty which grew out of a collision between the steamer Hawaiian and the barge Bright. Involved in the libel, though not present at the time of the collision, was the tug Samson. The Bright is a wooden schooner barge 258.3 feet in length, 46.6 feet in beam, and had a draft of 24′ 8″ forward and 26′ 2″ aft. The Hawaiian is a single screw cargo steamer 404.5 feet in length, 53 feet in beam, and had a draft of 11′ 8″ forward and 19′ 6″ aft.

At about midnight on August 28, 1940, the Samson anchored the Bright in the channel in Chesapeake Bay, about one-half or three-quarters of a mile South of Sharps Island Buoy. The Samson left the Bright on the following morning and did not return to the scene of the collision until after the collision. The barge was at anchor in this position until the collision, which occurred at about one-forty A. M. on August 31. At that time, the night was dark, the atmosphere was clear, the wind was light, and there was a flood tide.

The Hawaiian was proceeding Northward. Her navigation was in charge of a duly licensed pilot, Peter Sungals, and on the bridge with the pilot were the steamer's Master, Samuel A. Gates, and Third Officer O. E. Thompson. At the wheel was an able seaman, Konradsen, and on the forecastle head was stationed a lookout, ordinary seaman Hesser.

The bluff of the port bow of the Hawaiian, about 10 or 20 feet abaft the stem, collided with the forward port side of the Bright about abreast the Bright's No. 1 hatch. The angle of collision was about 10 degrees. The Hawaiian was undamaged. The Bright's hull, at the point of first contact, was so severely damaged that the Bright took in water and sank at about four A. M.

Judge Coleman held the Hawaiian wholly in fault, assessed damages accordingly, and the Hawaiian has taken an appeal to this Court.

Two serious contentions, which we must notice, were made on behalf of the Hawaiian: (1) The collision was due, partly at least, to the fact that the Bright was negligently anchored, in an unwarranted and dangerous position; (2) the Bright was displaying only one anchor light which was near her stern, instead of the two anchor lights, one forward and one near her stern, required of "a vessel one hundred and fifty feet or upward in length when at anchor".

Article 11, Inland Pilot Rules, 33 U.S.C.A. § 180.

We proceed to dispose of the first contention first. At the point of the Bright's anchorage, Chesapeake Bay is quite wide and the channel is broad. One advantage of this position is that had the Bright been anchored further East or West, she would have been in the path of tugs and tows which often have great difficulty in manoeuvering. Again, the point of anchorage was close to Sharps Island Buoy so that the Bright by day and her lights by night were in the line of vision of navigators or lookouts looking ahead to locate the buoy. There are no designated anchorages in Chesapeake Bay. See The John G. McCullough, D.C., 232 F. 637. As was said in The Strathleven, 4 Cir., 213 F. 975, 977: "If a vessel anchors at a point in the channel where, notwithstanding such anchorage, other vessels navigated with the care the situation requires can safely pass, then she has neither violated the statute nor rendered herself liable under the general rules applicable to navigation even though she has to a certain extent obstructed the channel."

See also The Caldy, 4 Cir., 153 F. 837; The Perseverance (The Winnetou), 2 Cir., 63 F.2d 788. Also, it is not without importance in this connection that the pilot of the Hawaiian, who was in charge of her at the time of the collision, testified frankly that if he had known that the Bright was a vessel at anchor, he could without doubt or difficulty have avoided the collision. We think that Judge Coleman was plainly right in holding that, in connection with the Bright's position of anchorage, neither the tug Samson, which towed the Bright to her position of anchorage, nor the barge Bright, was guilty of negligence contributing to the collision.

The second point gives a little more difficulty, and there was a sharp conflict in the testimony as to whether the bow light of the Bright was burning just before the collision. Judge Coleman did not make a clear and specific finding of fact in this connection, but we think it can be fairly inferred from his opinion that he believed this forward light was burning, though his decision was not placed squarely on that ground.

Seaman Macaulay on the Bright testified that after the lamps were cleaned, filled and lighted, he put both lamps up, one forward and one aft, and that at about

8:45 that night, when he left to go below, both of the lights were burning brightly. Seaman Herald of the Bright testified that when he went off watch at midnight on August 30, both of the lights on the Bright were burning. Captain Merriam of the Bright testified that when he took the watch at midnight on August 30, both lights were burning, but he was unable to testify that he saw the lights burning just before the collision. Captain Conway, Master of the power boat, Betty I. Conway, testified that he passed the Bright at 11:45 P. M. August 30, and both lights were then burning. Similar testimony was given by Mr. Watson, Mate on the steamer, Woonsocket, when his steamer passed the Bright less than half an hour before the collision.

Against this testimony must be weighed that of the Master, the Third Officer and the Pilot of the Hawaiian, all of whom testified that shortly before the collision they saw only one white light burning on the Bright. There was also some testimony, far from satisfactory, of two officers of passing steamers, that they saw only one light on the barge shortly before the collision. We think the preponderance of the testimony would indicate that the two lights were burning on the Bright at the time of the collision. See The Richmond, D.C., 114 F. 208, 211. The lookout on the Hawaiian testified that he saw two lights ahead several minutes before the collision occurred but that he thought these were buoy lights. There was also evidence that the booms on the Hawaiian obstructed the vision of those on the bridge and there was evidence to indicate that just before the collision, the attention of the officers on the bridge of the Hawaiian was diverted to two tows, one to the East and one to the West of the Sharps Island Buoy.

█ The testimony of the lookout of the Hawaiian showed clearly that he was not a competent lookout. He admitted that no superior officer of the Hawaiian had instructed him with respect to his duty of notifying those on the bridge as to lights or other objects which he saw. The lookout admitted that several minutes before the collision, he saw two lights ahead but that he did not report them to the officers on the bridge because he thought these were buoy lights and that they had been seen by the officers on the bridge. It is not the duty of the lookout to engage in speculation about the nature of what he sees; he should immediately report to the bridge any lights or any objects that he sees which might affect the navigation of his vessel. See The Madison, 2 Cir., 250 F. 850, 852; The Sea Gull, 23 Wall. 165, 23 L.Ed. 90; The Colorado, 91 U.S. 692, 23 L.Ed. 379.

The testimony of the Pilot of the Hawaiian is also incriminating. He stated that he first saw a dim white light, low to the water, a couple of degrees on a starboard bow, at an estimated distance of four or five miles, but that he thought it was the light on the stern of a small vessel under way, moving in the same direction as the Hawaiian. Yet the Hawaiian gave no signal, did not slacken speed, and made no effort to steer wide of the vessel ahead until this vessel could be more accurately identified. When the hull of the Bright was seen by those on the Hawaiian, it was too late to avert the collision, though actual efforts to do this were promptly made on the part of the Hawaiian.

█ As was said in The City of New York, 147 U.S. 72, 85, 13 S.Ct. 211, 216, 37 L.Ed. 84, 85: "Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption at least adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of such other vessel should be resolved in its favor." This rule, sometimes known as the Major and Minor Fault Rule, is also discussed and applied in General Seafoods Corporation v. J. S. Packard Dredging Co., 1 Cir., 120 F.2d 117.

There were other points in this case which we do not deem of sufficient importance to require discussion.

The decision of the District Court is affirmed.

Affirmed.