### THEOTHILATOS v. MARTIN MARINE TRANSP. CO.

### THE ROKOS VERGOTTIS.

No. 4922.

Circuit Court of Appeals, Fourth Circuit.

May 20, 1942.

Wilbur E. Dow, Jr., of New York City (Dow & Symmers, of New York City, and Leon T. Seawell and Hughes, Little & Seawell, all of Norfolk, Va., on the brief), for appellant.

John W. Oast, Jr., of Norfolk, Va., for appellee.

Before PARKER, SOPER, and DOBIE, Circuit Judges.

DOBIE, Circuit Judge.

This action in the court below was a libel by the owner of the barge Orleans against the steamship Rokos Vergottis, arising out of a collision between the steamship and the barge. The District Court found the Vergottis solely at fault and entered damages against the Vergottis in the sum of $23,923.44. An appeal was duly taken by the Vergottis.

The collision occurred in the open sea, a few miles North of Barnegat light, at about eight o'clock on the evening of November 23, 1940. The weather was favorable, the breeze was light and the sea was smooth. The course of the steamship was South, 22°, that of the tug and barges was South by West, one-half West. The steamer was proceeding at an approximate speed of ten knots an hour, the tug and barges at about half that speed. The fault of the Vergottis is admitted. Appellant, however, earnestly contends that the damages are excessive and that these damages should be divided. We proceed, then, to discuss the three serious questions raised in this appeal.

### The Fault of the Tug.

The tug Wellfleet had three barges in tow, tandem style. The first barge, Mt. Hope, was on a hawser of about 1,350 feet; the second barge, Orleans, the middle barge of the tow and the barge involved in the collision, was on a hawser of about 1,200 feet; the third and last barge of the tow was on a hawser of about 1,200 feet. The total length of the tow was over 4,000 feet.

We think the record amply sustains the statement in the opinion of the District Judge: "I conclude that the Vergottis was an overtaking vessel; that the flotilla was well lighted; and that it was the duty of the Vergottis to see the lights and to keep away from the flotilla; that the Vergottis failed in both of these duties and that such failure was the sole, proximate cause of the collision."

Appellant insists that the white light on the stern of the tug was too high, that it was placed in this position in order to facilitate the steering of the barges rather than to give proper warning to other vessels, and that the position of this light deceived and confused those charged with the navigation of the steamer. In this connection, we note the italicized words in Article 10 of the Rules, 33 U.S. C.A. § 80, as to the stern light of an overtaken vessel: "Such light shall be carried *as nearly as practicable* on the same level as the side lights." (Italics ours.) The evidence shows that this stern light on the tug was placed only about 8 or 9 feet higher than the side lights, and that the barge Montauk was fully lighted, so that the lights on the barge were readily visible to any vigilant lookout on the steamer. We think, accordingly, the position of the stern light on the tug was not a factor contributing materially to the collision.

We find no case, and we also find no principle in the ordinary and approved practice of seamen, which would require, under the circumstances of this case, that a lookout should be posted on the stern of the tug.

Nor are we impressed by the contention that the navigator of the tug was negligent in failing to sound his whistle, set up flares or give warning to the steamer when the danger of collision was apparent, and that this negligence of the tug was a proximate cause of the collision. The navigator of the tug did testify that he saw the approaching steamship "coming up, about two and a half miles behind us." He also observed the steamship shortly before the collision between the steamship and the barge Orleans, yet he still thought, as he appears to have been justified in thinking, "she was going to pass astern of

our tow," and "I had no dreams that he was going to run the tow down." Moreover, Mate Diggs, the navigator of the tug, did not even know there had been a collision until the next morning.

### The Fault of the Barge Montauk.

■ We come next to appellant's contention of fault on the part of the bargee of the tail barge, Montauk, who saw the Vergottis go past the Montauk and bear down on the Orleans, and yet he gave no signal, warning or outcry. The record, we think, sustains the finding of the District Judge that the bargee of the Montauk was not "guilty of any fault" and that "there was nothing he could do under the circumstances to prevent such a collision." .

■ The barge Montauk and the barge Orleans were separately owned and the barge Montauk was not impleaded in the instant proceeding. Under the facts of this case, we do not think the cases cited by appellant justify the principle that any fault of the Montauk could be imputed to the Orleans.

### Major and Minor Fault Rule.

Drakatos, navigating officer of the Vergottis, testified that he saw a white light ahead (this was the stern light of the tug) about a half-hour before the time of the collision, but that he "could not make it out, what kind of light it was". Yet the Vergottis did not slacken speed, gave no warning and made no real effort, until it was too late, to avoid a collision. See The Manhasset, D.C., 34 F. 408, 422. Perhaps the failure of those on the Vergottis to observe the lights on the barges may have been due, as the District Judge suggests, to the confusion attendant upon the changing of the watch on the Vergottis about the time of the collision. Incidentally, Theothilatos, Master of the Vergottis, failed to stand by after the collision and, upon the arrival of the steamship at Norfolk, he made no report of the collision to any of the port authorities. See 33 U.S.C.A. § 367, sometimes called the Stand-By Act. His excuse, that he thought no material damage had been done to the barge, is not altogether convincing.

■ Under all of the facts of this case, we think, too, that even if the evidence should indicate some neglect on the part of the tug or tow, nevertheless the evidence to this effect is so slight that there is ground for the application of the Major and Minor Fault Rule: "Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption at least adverse to its claim, and any reasonable doubt with regard to the propriety of such other vessel should be resolved in its favor." See The Bright (The Hawaiian), 124 F.2d 45, 47, 1942 A.M.C. 84, 88, decided recently by this Court, and cases therein cited. See, also, The Haven Belle, 4 Cir., 85 F.2d 939, 941.

### The Damages Awarded.

The most serious question raised on this appeal, we think, is appellant's contention that the damages awarded by the District Judge were excessive. These damages amounted to $23,923.44. Since the value of the barge Orleans prior to the collision was placed at approximately $40,000, these damages at first blush might seem excessive. Appellant questions the alleged misalignment on the port side of the Orleans, and raises the further point that the Orleans had not been repaired when this libel was filed.

The District Judge submitted the extent of the damages to George Lanning as Special Commissioner. Mr. Lanning, known to this Court as a capable and painstaking admiralty lawyer, made a comprehensive report, after an extended hearing, to the District Judge. At this hearing, all the parties in interest were more than adequately represented. On exceptions by the present appellant, the District Judge fully confirmed the report of the Commissioner.

■ In that connection, the District Judge observed: "After full consideration of the exceptions filed to the Special Commissioner's report, I am of the opinion that the report should be approved and confirmed. Practically all of the witnesses for both sides testified in person before the Special Commissioner, thus affording him a far better opportunity than the Court has of determining the weight that should be given to the testimony of the experts called by each side concerning the damages. In such a situation the Court should not hastily substitute its judgment for that of the Special Commissioner as to the weight and credibility to be given to their testimony. However, an examination of the transcript indicates that the clear weight of the

testimony submitted to the Commissioner is with the libellant."

We think there is no necessity to add further to this statement. And, finally, we think the authorities cited by the Commissioner amply sustain the principle, on the theory of depreciation in value, that collision damage may be collected on satisfactory evidence of the cost of reasonable and proper repairs, even though these repairs have not been, or may even never be, made. See The Elmer A. Keller, 2 Cir., 194 F. 339; Pennsylvania Railroad Co. v. Downer Towing Corp., 2 Cir., 11 F.2d 466, 467; The Bumble Bee, D.C., 1 F.Supp. 327; Streckfus Steamboat Line v. United States, 5 Cir., 27 F.2d 251; Nassau Sand & Gravel Co. v. Red Star Towing & Transp. Co., D.C., 52 F.2d 704; The Edwin Chilton, 2 Cir., 66 F.2d 413, 414.

The judgment of the District Court is affirmed.

Affirmed.