## THE BARGE NO. 16.

## THE MUD DUMP SCOW NO. 12.
### THE EUREKA.
#### No. 5395.

Circuit Court of Appeals, Fourth Circuit.
Dec. 4, 1945.

John W. Oast, Jr., of Norfolk, Va., for appellant.

William E. Kyle, of Norfolk, Va., for appellees.

Before DOBIE and NORTHCOTT, Circuit Judges, and HARRY E. WATKINS, District Judge.

HARRY E. WATKINS, District Judge.

This is an appeal by the owner of Carpenter Construction Company Barge No. 16 from a final decree, dismissing its libel against Mud Dump Scow No. 31 and Motor Tug Eureka. It arises out of an alleged collision of the scow with a mooring or shifting line leading from a concrete bulkhead to appellant's Derrick No. 23 at the Navy Supply Depot Annex, on Hampton Roads, Va.

Appellant was the owner of Barge No. 16 and Derrick No. 23, each being 100 feet in length, 32 feet in beam and 8 feet in depth. Mud Dump Scow No. 12 (stipulated to be No. 31), was a wooden vessel 90 feet in length, 30 feet in beam and 12 feet deep. The motor tug Eureka was 68.3 feet in length, 17.5 feet in beam and 6.5 feet in depth.

On December 2, 1943 the derrick and barge began the work of pulling up submerged piling from the site of an old launching way, off the face of the bulkhead. The derrick pulled the piles and placed them on the barge. To move or shift the derrick along the bulkhead, there was a hawser about 600 feet long, leading from a bollard near the edge of the bulkhead to the derrick. The bulkhead faced west. As the work progressed toward the south, the hawser was shortened until on the morning of January 4, 1944, it was about 220 feet long. The hawser was a one and one-half inch line and was new when the work started. On the early morning of January 4, 1944, the barge was on the offshore northern corner of the derrick. Work had ceased and the only person on the derrick or barge was the night watchman. The derrick was moored to the bulkhead by four additional one and one-half inch lines leading from the derrick to the bulkhead. There was a stern line from the south end of the derrick tied to heavy machinery on the bulkhead; a quarter line fastened to heavy machinery on the bulkhead and the amidships of the derrick; another short line leading from the northeast end of the derrick to heavy equipment on the bulkhead; and a fourth

line, being a breast line leading from the northwest corner of the derrick about 85 feet to the fender system. The barge was moored to the offshore side of the derrick by four one and one-half inch lines. One line about 20 feet long led from the south inshore mooring cleat of the barge to the south offshore bollard on the derrick; another line running astern to the derrick; and approximately the same thing on the other end, the line going from the derrick to the north end of the barge; and a line coming from the tie post over a cleat approximately in the center, and then going back to the north of the barge.

On the early morning of January 4, 1944, between the hours of 4:00 and 5:00 o'clock, the tug Eureka, with her stem against the amidships of Mud Dump Scow No. 31, pushed the scow broadside toward the bulkhead for a berth there. The sea was very rough, with a back-swell of the sea, and with a northwest or offshore wind of approximately 35 miles per hour. The sea was breaking over, hitting the bulkhead and coming back to such extent that it was felt wise to take the scow to the bulkhead for a berth. The weather was so bad that for reasons of safety the loading of the mud scow had been discontinued. After the scow had moved to a berth near the derrick, the north end of the scow extended about 8 feet north of the bollard to which the 220 foot hawser of the derrick was made fast by an eye in the hawser. About the same time the scow moved to a berth this 220-foot hawser extending from the derrick to the bollard on the bulkhead, parted. Shortly thereafter the two southern lines mooring the barge to the derrick parted, and the barge moved around to a point north of the derrick over some submerged piling, which penetrated its bottom and caused it to sink. No damage was sustained by the mud scow or the tug. There was a dispute in the evidence as to whether the scow ever came in contact with the hawser. The District Judge found that "if contact was made with the 220-foot hawser by the mud dump scow, such contact was not responsible for the breaking of the hawser". He found that "The 220-foot line was worn and chafed before the mud dump scow came into the bulkhead and it parted as a result of the strain imposed by wind and tides."

Gilliam, the watchman on the derrick, and Horne, a marine sentry, both testi-fied that the the barge was moored beside the derrick when the mud scow was berthed. Messick, captain of the tug Eureka, and the only witness for appellee, testified that the barge was sunk before the scow was berthed. That testimony of Messick was rejected by the District Judge, and we believe the District Judge was entirely right in doing so. Messick also testified that the mud scow never came in contact with the 220-foot hawser. The trial court made no specific finding as to this point. We believe that the contact of the mud scow with the hawser is definitely fixed by the testimony of the disinterested witness Horne, and by Gilliam, and by the surrounding circumstances.

At the trial, several months after the disaster, the District Judge examined the rope and found that it had a worn or chafed place between the point of break and the bollard. The rope was again exhibited at the argument in this court. The foreman on the derrick testified that on the afternoon of January 3 he looked at the rope and found no "pinch" places in it. He made it clear that he had not gotten down and examined it but looked at it as he walked down the bulkhead. Gilliam testified to the same effect. The trial court found that the rope was chafed and was just ready to part when the mud scow approached, and that the rough seas and wind, and not the mud scow, caused it to part. A careful study of the record in the light of arguments and briefs of counsel convinces us that this conclusion of the trial court, based chiefly upon his examination of the rope months after the disaster, is not supported by the evidence. It is clear to us that the mud scow came in contact with the line while it was still intact, and that the line parted immediately thereafter. If the line had been worn and frayed, the immediate cause of its parting was, in our opinion, the contact with the mud scow.

We come next to appellee's contention that, even though the mud scow caused the 220-foot line to part, the parting of such line had nothing to do with the sinking of the barge. Counsel for appellant at the trial stated his position as follows: "It is our view that this mud scow coming in there first snatched the line, which was slack, and then it put the weight of the mud scow against the line so that it pinched it up against the bulkhead and parted it." Appellant contends that the

contact of the mud scow with this line along the side of the bulkhead was so severe that it caused two separate mooring lines leading from the stern of the barge to the derrick to part, thereby causing the barge to drift around into a position where it was pitched by the rough water and high wind then prevailing against submerged piling and caused to sink. Gilliam testified that when the mud scow parted the 220-foot line it pulled the derrick back five feet. In weighing this evidence of an employe of the appellant, we must bear in mind that the purpose of this long 220-foot line was to pull the derrick along the shore as the work progressed. Four other lines of the same size were used for mooring the derrick to the bulkhead. Gilliam testified that on the night of the accident these four lines held the derrick "up against" the bulkhead. At any rate it is clear from the evidence that work had ceased on the derrick, that the sea was rough, and it had been moored closely and securely to the bulkhead. These four lines were never parted and were in good condition after the accident. Any strain would be upon these four lines as the 220-foot line was made fast to the stern of the derrick, not to the piling barge that was sunk. The two lines which parted and permitted the barge to drift around into a position of danger were two of four lines mooring the barge to the derrick. They were in no manner connected with the 220-foot line or the four lines which moored the derrick to the bulkhead. These two lines which parted and caused the barge to sink about an hour after the scow was berthed were of the same size as all the other lines. These lines, in possession of appellant after the barge was moved for repairs, were never introduced in evidence, and we know nothing of their condition, except as given by Gilliam, who testified that they were in good condition before the accident.

Another important factor which would indicate that there was little, if any, strain upon these lines caused by the mud scow, is that the wind was from the northwest, blowing toward shore and toward the bollard to which the 220-foot hawser was made fast. That wind would tend to blow the barge to the south and to the east, which would be toward the side of the derrick.

Another significant fact is the distance of the hawser from the concrete bulkhead at the time is was contacted. The tug was pushing the mud scow broadside when the scow struck the line at a point about 100 feet from the bollard. At the point of contact the line was only six and one-half feet beyond the cement bulkhead, so that the scow would have only a few feet to travel after contacting the line before hitting the bulkhead. Neither the scow nor the tug was damaged in any way from hitting the bulkhead with any great amount of force. The marine who was standing nearby testified that he heard no noise when the line parted. The line was slack and this slack would be taken up to some extent when the scow came in contact with the line.

In determining whether the parting of the 220-foot line caused the damage we must bear in mind that the sea was very rough. Before the mud scow and tug appeared on the scene the piling barge was in danger. Gilliam, the watchman, had gone to a telephone about one-half hour before the scow was berthed to tell Starling, his superior, "to put the piling barge in a much safer position on account of the high seas."

Under these circumstances we do not believe that there was any causal connection between the parting of the 220-foot line and the sinking of the barge. We think the record amply sustains the finding of the trial court: "That the barge suffered no damage due to the operation of the tug Eureka or the mud dump scow, or either of them".

Appellant insists that this is a proper case for the application of the Major and Minor Fault Rule, and cites The Bright, 4 Cir., 124 F.2d 45, 47, and The Rokos Vergottis, 4 Cir., 127 F.2d 1016, wherein Judge Dobie, speaking for this court in each case, and citing The City of New York, 147 U.S. 72, 85, 13 S.Ct. 211, 216, 37 L.Ed. 84, 85, states the rule as follows: "Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. There is some presumption at least adverse to its claim, and any reasonable doubt with regard to the propriety of the conduct of such other vessel should be resolved in its favor." The mere statement of the rule refutes its applicability to the facts of this case. The difficulty

encountered is that here the fault of the tug and scow in parting the line is not of itself sufficient to account for the accident. The evidence shows no causal connection between the parting of the line and the damage claimed, and it, therefore, follows that the rule cited is not applicable.

For the reasons stated, the decree appealed from will be affirmed.

Affirmed.