SEATRAIN LINES, Inc., as Owner of THE S. S. SEATRAIN TEXAS, and as Bailee of Cargo and Owner or Bailee of Freight Cars Laden therein, Libelant, and The American Insurance Company of Newark, New Jersey, et al., Intervening Petitioners,

v.

Motor Vessel EKEFORS, her engines, boilers, etc. and Fridafors Fabriks A/B Respondent and Claimant.

No. 19388.

United States District Court,
E. D. New York.

July 26, 1954.

102

Hunt, Hill & Betts, New York City, for Seatrain Lines, Inc., and the Steamer Seatrain Texas, by John W. Crandall, Robert M. Donohue, New York City, of counsel.

Hill, Rivkins, Middleton, Louis & Warburton, New York City, for Motor Vessel Ekefors and Fridafors Fabriks A/B, claimant and cross-libelant, by Thomas H. Middleton, Allan B. Lutz, New York City, of counsel.

Burlingham, Hupper & Kennedy, New York City, for Steamship Santa Monica and Grace Line, Inc., claimant, by A. Howard Neely, Robert F. Lynch, New York City, of counsel.

INCH, Chief Judge.

These consolidated actions arise out of a collision between the steamship Seatrain Texas and the motor vessel Ekefors south of Fort Wadsworth in the Narrows, New York Harbor, on December 16, 1949.

Seatrain Lines, Inc., as owner of The Seatrain Texas, filed a libel against The Ekefors on December 29, 1949 claiming damages of $200,000, and the stipulation for value filed by Fridafors Fabriks A/B, as owner of The Ekefors, was later reduced to $168,000. Fridafors filed a cross-libel against The Seatrain Texas and her owner on January 27, 1950 for damages amounting to $100,000, and thereafter the stipulation for value filed by Seatrain Lines, Inc. was reduced to $50,000.

The American Insurance Company of Newark, New Jersey and other insurers of cargo of The Seatrain Texas filed an intervening petition in The Seatrain Lines suit against The Ekefors, claiming damages to the cargo, including general average, salvage charges and incidental expenses amounting to $8,500.

On November 28, 1952, after the substitution of its original proctors and almost three years after the collision, Seatrain Lines, Inc. filed a libel against the steamship Santa Monica which had been in the vicinity of the collision and also filed a petition impleading The Santa Monica in The Fridafors cross-suit against The Seatrain Texas and its owner. The American Insurance Company of Newark, New Jersey and the other cargo insurers which had intervened in the suit of Seatrain Lines, Inc. against The Ekefors also intervened in The Seatrain Lines, Inc. suit against The Santa Monica.

Although there is considerable conflict in the evidence as to certain lights, headings, speeds and distances, many of the material facts are not in dispute.

The Seatrain Texas, a vessel of 8,108 tons, and specially constructed to carry railroad cars, left Edgewater, N. J. fully loaded with freight cars at about 4:30 P.M. on December 16, 1949 bound for New Orleans. The steamship Santa Monica, a passenger and cargo vessel of 8,610 tons, sailed from Pier 45, North River loaded with cargo at about 5:00 P.M. on the same day bound for South American ports.

At about 5:30 P.M. both vessels were proceeding south down the main ship channel off Staten Island toward the Narrows and Ambrose Channel. The width of the channel at the Narrows between Fort Wadsworth and Fort Lafayette is approximately 4,000 feet. The Seatrain Texas was on the starboard side of the channel, and off her stern port quarter The Santa Monica was running a parallel course approximately 500 feet to the east of The Seatrain Texas' course. The Santa Monica was proceeding at a speed of between 12 and 13 knots and was overhauling The Seatrain Texas very slowly. Eventually the bow of The Santa Monica overlapped the port stern quarter of The Seatrain Texas, but she never drew abreast of or overtook The Seatrain Texas, and she remained in this same relative position until she turned away from the impending collision.

The Seatrain Texas increased the number of nozzles operating in its steam turbine engines from 9 to 17 at 5:40 P.M. and at 5:45 P.M. further increased the nozzles from 17 to 21. This last increase occurred 6 minutes before the collision and was maintained until after the collision. Although the Chief Engineer of The Seatrain Texas testified that 21 nozzles would give the ship a speed of 15½ knots, her Master testified that it would "probably" be 14 knots after "you get up there and get going, and get everything set", but that shortly before the collision he was only going 12½ or 13 knots which he admitted was "a little above normal harbor speed."

On the bridge of both The Santa Monica and The Seatrain Texas were the master, chief officer and a Sandy Hook pilot, and each vessel had a quartermaster at the wheel and a lookout stationed at the bow. The second officer and a carpenter of The Santa Monica were standing by the anchors, but no one was sta-

tioned at the anchors of The Seatrain Texas. The navigation lights of both vessels were set and burning brightly. The weather conditions were excellent with visibility unlimited, wind from the north at about Force Two and the tide was at the last of the flood with a speed of approximately one knot.

When the vessels were about off Quarantine Station the inbound Ekefors was observed in Ambrose Channel some distance below Craven Shoal Buoy (Buoy 19–A) approximately 2½ to 3 miles away.

When first sighted by The Santa Monica The Ekefors' red port light and her range lights were visible off The Santa Monica's port bow. Shortly thereafter both The Ekefors' sidelights became visible with her range lights almost in line, bearing fine on The Santa Monica's port bow. The Santa Monica thereupon blew a one-blast signal to The Ekefors thereby proposing a port to port passing. About twenty seconds later The Seatrain Texas likewise blew a one-blast signal to The Ekefors and put her rudder "easy right". The pilot of The Seatrain Texas testified that The Ekefors was then about one mile away, but according to the captain of The Santa Monica The Ekefors was then more than two miles off. The Ekefors did not reply to either of these one-blast signals, but continued to swing to the left shutting out her red side light and showing only her green starboard light. The harbor pilot aboard The Santa Monica remarked to the captain of The Santa Monica: "He is going to head in for Quarantine and beat the 6 o'clock curfew, so we better get out of here". Consequently The Santa Monica swung to the left 30 or 40 degrees and went over to the Brooklyn side of the Narrows just inside the entrance to Gravesend Bay with the Navy mooring buoys on her starboard side. Thus The Santa Monica was about a mile away when The Ekefors and The Seatrain Texas collided.

When The Ekefors failed to answer the one-blast signals from The Santa Monica and The Seatrain Texas, The Seatrain Texas repeated her one-blast signal within about one-half a minute. The Ekefors thereupon blew a cross-signal of two blasts and continued her swing to port. The Seatrain Texas then blew an alarm and one blast and put her rudder "hard right". The Ekefors blew an alarm and two blasts, and The Seatrain Texas again blew an alarm and one blast and repeated these signals.

The vessels collided at about 5:51 P.M. a short distance south of the Fort Wadsworth light close to the Staten Island shore. Shortly before the collision The Ekefors put her engines in reverse and dropped her port anchor. The Seatrain Texas continued at "full ahead" until after the collision, but her rudder was put hard left just prior to the collision in an effort to pivot her port side away from the bow of The Ekefors. Nevertheless, the bow of The Ekefors struck the port side of The Seatrain Texas at about an 80-degree angle.

■ Turning first to The Santa Monica, it is plain on this record that she was free from fault. It is significant that The Ekefors makes no complaint concerning the navigation of The Santa Monica and does not allege any fault against her. The Seatrain Texas, however, contends that The Santa Monica violated Article 18, Rule VIII, 33 U.S. C.A. § 203, in that she attempted to pass The Seatrain Texas without sounding an overtaking signal. The fact is, as already stated, that The Santa Monica at no time overtook The Seatrain Texas, and although her bow eventually overlapped the stern quarter of The Seatrain Texas, she maintained that position until she turned away from the impending collision. I cannot find on this proof that The Santa Monica attempted or even intended to pass The Seatrain Texas prior to the collision, and under such circumstances a passing signal was not required. See: The Pleiades, 2 Cir., 9 F.2d 804, 806, certiorari denied 270 U.S. 662, 46 S.Ct. 471, 70 L.Ed. 787. Moreover, had The Santa Monica complied with the above rule, after The Ekefors was sighted, by blowing a two-blast sig-

nal to pass on the port side of The Seatrain Texas, such a signal would in all likelihood have only added to the existing confusion and danger and certainly would not have prevented the subsequent collision.

The Seatrain Texas also contends that The Santa Monica's negligent navigation contributed to the collision. The libel of The Seatrain Texas charged that The Santa Monica was guilty of fault in that in "overtaking and passing The Seatrain Texas in the face of the on-coming Ekefors she boxed in The Seatrain Texas, making it impossible for the navigators of The Seatrain Texas to take avoiding action by going to port in their discretion when they observed The Ekefors proceeding to the westward and across her course." The proctors for The Seatrain Texas also charge in their brief that The Santa Monica was negligent in attempting "to pass The *Seatrain Texas* at the same time that she proposed a port to port passing to The *Ekefors*", and that she thereby created "a most complicated situation". (Brief, p. 25) Again it must be said that the allegation that The Santa Monica was attempting to pass The Seatrain Texas is not supported by the evidence. Both vessels were proceeding on parallel courses when The Ekefors was sighted, and both vessels signaled for a port to port passing with The Ekefors which could have been easily accomplished had The Ekefors held to her side of the channel. When the navigators of The Santa Monica recognized shortly thereafter that The Ekefors intended to cut across the channel to Quarantine they promptly swung to the left and thereby prudently provided The Ekefors and The Seatrain Texas with the greatest possible area in which to navigate. Accordingly, I do not find that The Santa Monica's presence in the vicinity in any way contributed to the collision between The Ekefors and The Seatrain Texas. This opinion must also have been shared by the masters and pilots of the vessels involved in the collision, for it is significant that The Santa Monica was not mentioned in their various log entries and contemporaneous reports. The Seatrain Texas' rough log makes no mention of The Santa Monica, and the report of its master to the Coast Guard dated December 22, 1949 makes no reference to The Santa Monica. The pilot of The Ekefors likewise failed to note the presence of the Santa Monica in his report to the Coast Guard dated December 19, 1949. While the pilot of The Seatrain Texas referred to The Santa Monica in his report to the pilots association dated December 19, 1949, he did not in any way charge the vessel with fault. These omissions from the official reports and log entries are entitled to serious consideration particularly when taken together with the fact that no claim was made against The Santa Monica until almost three years after the collision.

■ Coming now to The Ekefors, its fault is so apparent as to require little discussion. In fact her proctors candidly state that while "The Ekefors does not admit her fault, she does not strenuously deny it." (Brief, p. 2) It is also noteworthy that The Ekefors only produced as witnesses her helmsman and her harbor pilot and that she failed to call any other officer or member of her crew and offered no excuse for their non-production.

The Ekefors was guilty of fault on various grounds. First, she violated Article 25 of the Inland Rules, 33 U.S.C.A. § 210, by failing to keep to her side of this narrow channel and pass The Seatrain Texas port to port. Admittedly there was nothing to prevent her from keeping to the right or easterly side of the channel instead of swinging diagonally across the channel to Quarantine and across the courses of the outbound Seatrain Texas and Santa Monica. Secondly, in addition to violating the above Narrow Channel Rule, she failed to follow the normal and usual procedure for vessels inbound to Quarantine on a flood tide. There is substantial credible evidence to the effect that the customary procedure for incoming vessels on a flood tide is "to go up on the right side of

the channel until they get near Fort Hamilton, and then slow down, and when the waters are clear to go across the channel and swing around into the flood tide and drop their anchor." Thirdly, The Ekefors was at fault for failing to hear the one-blast signal of The Santa Monica and the repeated one-blast and danger signals of The Seatrain Texas. Her pilot testified that he heard no signals at all from the other two vessels. These vessels were only 2½ to 3 miles away with the wind blowing from the north toward The Ekefors which had its pilot house windows and doors open. Under these circumstances it can only be inferred that The Ekefors was not maintaining a proper lookout or that the lookout did not attend properly to his duties. The New York, 175 U.S. 187, 204, 20 S.Ct. 67, 44 L.Ed. 126. The explanation of The Ekefors' pilot that the hills on Staten Island "offer quite a stop to the whistles" and "throws off that echo to the eastward" is hardly worthy of belief in view of the other evidence in the record to the contrary. Finally, The Ekefors was at fault for blowing a "cross signal" of two blasts to The Seatrain Texas' second signal of one blast. Inland Inspectors' Rule 312.2 (33 C.F.R. Sec. 80.2) provides:

"*Cross signals.* Steam vessels are forbidden to use what has become technically known among pilots as 'cross signals', that is answering one whistle with two, and answering two whistles with one."

The Ekefors plainly violated this rule when it blew two whistles in answer to The Seatrain Texas' one-blast signal.

■ The fault of The Seatrain Texas is not quite as plain as that of The Ekefors, and it is argued that, if there is any doubt as to her navigation, she is entitled to exoneration under the "major and minor fault doctrine" as stated in The Umbria, 166 U.S. 404, 409, 17 S.Ct. 610, 41 L.Ed. 1053; Theothilatos v. Martin Marine Transp. Co., 4 Cir., 127 F.2d 1016, 1018; Globe Oil Delivery Corp. v. City of New York, 2 Cir., 129 F.2d 636, 638; The Victory (The Ply-mothian) 168 U.S. 410, 423, 18 S.Ct. 149, 42 L.Ed. 519, and other cases. But even this rule "will not excuse a plain fault". See The San Simeon, 2 Cir., 63 F.2d 798, 800, citing The Albert Dumois, 177 U.S. 240, at page 253, 20 S.Ct. 595, at page 600, 44 L.Ed. 751, wherein the Supreme Court said:

"This court has repeatedly held the fault, and even the gross fault of one vessel, does not absolve the other from the use of such precautions as good judgment and accomplished seamanship require. (Citing cases.)"

■ One of the faults charged against The Seatrain Texas is that she failed to stop and reverse her engines when she knew that The Ekefors was crossing her course and knew or should have known that a dangerous situation was developing. This question depends, as it does in many collision cases, upon factors of time, distance and speed, concerning which there is considerable conflict in this record. However, there are certain facts which cannot be seriously disputed. Concededly The Seatrain Texas was proceeding "full ahead on the throttle" at "a little above normal harbor speed" and her speed was increasing. She continued on at such speed until after the impact of the collision.

The pilot of The Seatrain Texas testified that at the time The Ekefors "cracked" her lights to the westward, i. e. opened her green light in addition to her red light, he heard The Ekefors reply to his second one-blast signal with a cross-signal of two blasts. It is also reasonably clear that very shortly thereafter the navigators of The Seatrain Texas saw The Ekefors open her green side lights and shut out her red side light and that this occurred approximately a minute and a half to two minutes prior to the collision. It was also apparent to them at this time that The Ekefors was swinging steadily across their course and that there was serious danger of a collision.

As for the distance between the vessels, the captain of The Seatrain Texas

and her harbor pilot claimed that when The Ekefors blew her first two-blast signal she was less than a half a mile away and that when she shut out her green light she was less than a quarter of a mile away. On this issue, however, I am more inclined to accept the more disinterested testimony of the captain and harbor pilot of The Santa Monica both of whom testified that when The Ekefors showed only her green light she was approximately two miles away. The harbor pilot, however, had testified before the Coast Guard that at this time "we were closing a mile fast".

As above stated, when The Ekefors indicated her intention of heading toward Quarantine The Santa Monica promptly turned to the left toward the entrance to Gravesend Bay. Those in charge of The Santa Monica testified that at that time The Ekefors was still between one and two miles away. Although The Santa Monica had left the scene promptly, The Seatrain Texas continued on for several minutes at unabated speed.

Thus the proof shows that The Seatrain Texas was proceeding above normal harbor speed and her speed was increasing when she received a two-blast "cross-signal" to her second one-blast signal, and almost simultaneously therewith she observed The Ekefors shut out her red light and open her green light which plainly indicated that The Ekefors was swinging across The Seatrain Texas' course. This was one and a half to two minutes before the collision and while The Ekefors was more than a mile away. Despite this apparent danger of collision, The Seatrain Texas did not attempt to reduce her speed or stop, as she had ample opportunity to do at this point and particularly since she was bucking a flood tide. Instead she blew an alarm and one blast and put her rudder hard right, and thereafter blew three more alarms each followed by a single blast. In all, The Seatrain Texas sounded five one-blast signals and four alarms in its insistence on a port to port passage without the consent of The Ekefors. In fact the harbor pilot of The Seatrain Texas made the following admission:

"Q. You wanted to insist upon a port to port passing at all costs. That is what it amounts to, isn't it?

A. Yes."

In a similar situation the Supreme Court said in The Albert Dumois, supra, 177 U.S. at pages 251–252, 20 S.Ct. at page 600:

"Her testimony indicates that she [the Argo] made the white and red lights of the Dumois upon her port bow, and blew her a signal of one whistle; that the Dumois responded with a signal of two whistles, starboarded her helm, shut in her red and exhibited her green light, and took her course across the path of the Argo. The Argo blew her a signal of one whistle, to which the Dumois again responded with two, followed it with a danger signal, and the Argo, still maintaining her great speed, put her wheel hard-aport, struck the Dumois upon her starboard bow, and was herself almost immediately sunk by the force of the impact.

"The master of the Argo excuses his failure to stop and reverse *which it was his duty to do as soon as he saw the wrong manoeuvere of the Dumois,* by the fact that the starboarding of the Dumois put him in a position in which he was obliged to decide instantly what ought to be done; that, in the exercise of his best judgment, he determined to put his helm hard-a-port, and endeavor to cross the bows of the Dumois; and that, if he made a mistake in this particular, it was an error *in extremis,* for which the Argo is not responsible. The argument is undoubtedly entitled to great weight, but we think the real error was not committed *in extremis.* The theory of the Argo is that she was coming down the middle of the river, and that she made the Dumois on her port bow, exhibiting a red light.

She was running herself at 20 miles an hour, with the added force of the current. The Dumois was running against the current at the rate of nine miles an hour. That the Dumois must have starboarded and shown her green light some time before the Argo ported is evident from the place of the collision * * *—she must have run under her starboard helm about a quarter of a mile before reaching the point of collision. Now, if the Argo had promptly ported as soon as she heard the cross-signal or observed the starboarding of the Dumois, she would inevitably have passed the point of intersection before the Dumois reached it. The fault of the Argo was not in the hard-a-port order when the collision was inevitable, *but in failing to stop and reverse at once as soon as she noticed the starboarding of the Dumois.*" (Emphasis supplied.)

Here the captain of The Seatrain Texas testified that when he observed the course The Ekefors was steering up the center of the Channel he "didn't know" what The Ekefors "was doing" and that "we were puzzled. I was puzzled." The duty to stop and reverse under such circumstances was clearly stated by our Court of Appeals in The Quogue, 2 Cir., 47 F.2d 873. There the tug Transfer No. 12 with a carfloat fast on each side, and the tug Quogue with a carfloat on her port side began to navigate with respect to each other when they were some 2,000 feet apart and in position to pass port to port. The Transfer blew a single blast to which The Quogue replied with two. The Transfer thereupon blew an alarm, slowed her engines, and again signaled for a port to port passage. To this second signal The Quogue again blew twice and sounded an alarm. The Transfer then stopped her engines and again blew an alarm and one blast. The Quogue hauled to port to cross The Transfer's bow, and although both vessels reversed their engines their tows collided. About three or four minutes elapsed between The Transfer's first signal and the collision. Judge Swan writing for the Court which held that the damages should be divided said: 47 F.2d at pages 873–874.

"The fault of the Quogue was most glaring. Indeed, she makes no attempt to excuse it, but contends merely that damages should be divided because the Transfer did not stop and reverse more promptly. It is a hard rule which requires a master when he sees another vessel about to cross his bow with wanton disregard of his rights to stop and allow the arrogant usurper to pursue his wrongful course. But safety is better than pride; and, however slight the hope that rules to promote safety will be observed under such circumstances, whatever courts may say, the vessels must be judged according to their legal duties.

"When the Transfer's one whistle was crossed for a second time by the Quogue's two, the former's master still assumed that the Quogue would not carry out the maneuver indicated by her signals unless he consented. He was not justified, however, in acting on that assumption; for, as he testified and as he indicated by blowing alarms, there immediately arose a situation of danger provided the Quogue should proceed to execute, as she shortly did, the maneuver indicated by her signals. His duty as a prudent navigator was not merely to sound the alarm and slow and stop his engines, but to get the way off his vessel as promptly as possible. He did not reverse as promptly as he should. He was not privileged to continue on his course on the chance that the other vessel would change her announced purpose if he refused to consent. It is true that the Pilot Rules (article 18, Rule III, and Inspectors' Rule I) provide only for sounding the

danger signal when one vessel fails to understand the course or intention of another which is approaching; but, independently of what the Pilot Rules may require, the courts have very definitely declared that *there is a duty to stop and reverse as soon as danger of collision is seen to exist because of doubt as to what the other vessel may do.* (Cases cited.) However great the temptation of the Transfer's master to refuse to give way to a vessel wantonly insisting on crossing his bow, his duty clearly required him to stop and reverse instead of obstinately insisting on his right to a port to port passage. See The Senator Rice [2 Cir.], 223 F. 524, 527." (Emphasis supplied.)

Those in charge of The Seatrain Texas were admittedly "puzzled" when they observed The Ekefors coming up the center of the channel, and when she blew a cross-signal and shut out her red and showed only her green light, then certainly they should have complied with their plain duty to take prompt action to stop and reverse their engines, instead of gambling with an attempt to pass between The Ekefors and the Staten Island shore.

■ In The New York, supra, 175 U.S. at page 201, 20 S.Ct. at page 72, the Supreme Court stated:

"Nothing is better settled than that, if a steamer be approaching another vessel which has disregarded her signals, or whose position or movements are uncertain, she is bound to stop until her course be ascertained with certainty. (Cases cited.)"

■ Also applicable is the following from A. H. Bull S. S. Co. v. Chesapeake S. S. Co., 4 Cir., 101 F.2d 599, 601:

"It was the duty of both vessels when confusion became apparent to order full speed astern and to blow danger signals. Neither vessel did this until too late to avoid the collision."

Without citing further authorities, it is my opinion that The Seatrain Texas was guilty of a plain fault in negligently insisting on a port to port passing without receiving an assent from The Ekefors and without any attempt to stop and reverse her engines. Since this fault is sufficient to hold The Seatrain Texas liable for half damages See: Ahlgren v. Red Star Towing & Transportation Co., Inc., 2 Cir., 214 F.2d 618, it is unnecessary to discuss the other faults charged against The Seatrain Texas.

■ In conclusion it is to be noted that I have given no consideration to the evidence submitted on behalf of The Seatrain Texas in connection with the so-called "Crash–Stop Test" made on the Hudson River on March 2, 1954 for the following reasons: (a) the evidence conclusively establishes that the navigators of The Seatrain Texas had no intention of stopping their vessel at any time prior to the collision; (b) her pilot testified that at the time of the collision he did not know how long it would take him to stop The Seatrain Texas and that he did not even discuss it with her captain who was on the bridge at the time; and (c) that the physical conditions at the time of the test were substantially dissimilar from those prevailing at the time of the collision.

Accordingly, a decree should be entered holding The Seatrain Texas and the Ekefors equally at fault and dismissing the libel and impleading petition of Seatrain Lines, Inc. against The Santa Monica with costs.

Findings of fact and conclusions of law are being filed simultaneously herewith.