## A/B SVENSKA AMERIKA LINIEN v. STANDARD OIL CO. OF NEW JERSEY.

### No. 338.

Circuit Court of Appeals, Second Circuit.

July 17, 1939.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (W. H. McGrann, Ira A. Campbell, J. Harvey Turnure, and Eugene F. Gilligan, all of New York City, of counsel), for Standard Oil Co. of New Jersey and The A. C. Bedford.

Haight, Griffin, Deming & Gardner, of New York City (John W. Griffin and W. Parker Sedgwick, both of New York City, of counsel), for libelant-appellee.

Before L. HAND, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

L. HAND, Circuit Judge.

■ This appeal involves the liabilities arising out of a collision on the high seas, not far east of the Nantucket Lightship, in full daylight but in a fog, between the tanker, "Bedford", and the passenger steamer, "Kungsholm". The Bedford was heading north two degrees east; the Kungsholm, due west—270° true—their courses were therefore at right angles. The Kungsholm's bow struck the Bedford on her starboard side a little forward of midships, at an angle of about 45 degrees; the change in the relative heading of the vessels was altogether due to the Kungsholm's hard right rudder. The air had been clear until about eleven or twelve minutes before the collision, when a light fog appeared which gradually thickened until the visibility was between 300 and 600 feet. Each vessel had reduced her speed upon entering this fog, and had begun to blow the regulation fog signal of one blast. The Bedford continued under way until she heard the Kungsholm's whistle on her starboard bow, when she stopped. From then until the collision she blew two blasts instead of one, to indicate that she was lying still in the water. Article 15(b) of the International Rules, 33 U.S.C.A. § 91(b). Her officers testified that she had lost all her way, and was lying still at the time of the collision, but the judge found that she had kept on at about three or four knots, at which speed she was crossing the Kungsholm's bow when the vessels sighted each other. She does not appeal from this finding of fact, nor indeed does she any longer seek to exculpate herself; but she argues that the Kungsholm was also at fault, and that the damages must be divided.

The faults which she ascribes to the Kungsholm are: too great speed for the fog; a failure to back at once on learning that the Bedford was not conforming with her stop signal; a right rudder, instead of a left, in the final effort to escape collision. We do not find it necessary to decide whether the Kungsholm had properly reduced her speed when she entered the fog and before she heard the Bedford's whistle, although we will arguendo assume that if her speed had not been so great as it was, she might have run off enough of it, after she stopped on hearing the Bedford's whistle, to have killed what remained by backing. We may decide the case in this way because the Bedford's own fault made the issue immaterial. When a vessel "under way" gives a series of two blasts in conformity with Article 15(b) she must be "stopped". The purpose is to advise all other vessels that in fact she is not moving, and that they may shape their navigation accordingly. The signal is an announcement to the other vessel quite the same as though she should say by her wireless: "I have stopped and you may pass." Article 16, 33 U.S.C.A. § 92, does indeed still apply to the moving vessel; upon hearing the double blast forward of her beam, she must stop her engines until she "ascertains" the position of the "lying-to" vessel, and must thereafter "proceed with caution". But the only caution necessary towards the "lying-to" vessel, if she continues to remain "stopped", is to "ascertain" the place where she is and to avoid it; if the moving vessel does that she has fulfilled her complete duty towards the other. Whether the moving vessel, having correctly "ascertained" the position of the "lying-to" vessel, passes her at too high speed is no affair of that vessel; indeed the faster she goes, the sooner the "danger of collision is over". Such speed will, of course, be a fault on the part of the moving vessel, and will create liability to any third vessel which may suffer from it; but not to the "lying-to" vessel. This is true because speed can contribute to a collision between the two only in case the "lying-to" vessel changes her position contrary to her declaration. It is precisely as though a person were hurt by too fast driving upon a street which he had assured the driver he would not enter. Whoever else could successfully complain, he could not.

■■ To meet this the Bedford says that although a double blast does indeed mean that the vessel giving it is then lying to, it does not mean that she will remain so. Obviously she need not if the other vessel also blows that signal: in that case one of them must start up in order for the "danger of collision" ever to be "over". Hence, she says, it is always permissible for the "lying-to" vessel to start up, and she is bound not to repeat a double blast after she is under way. As we understand this argument, it would result that there might be an interval of substantially two minutes during which the "lying-to" vessel might be moving though her last signal indicated that she was still "stopped". We are not sure that,

having once chosen to lie to, a vessel may later get under way at all except when the other vessel has indicated that she too is lying to; but we will not so hold. Assuming that she may start up, before doing so she must indicate her change of purpose; the one thing she may not do is to get under way, while leaving the other vessel under the impression that she is still "stopped". She must blow a signal of one blast at the very moment she turns in her order to the engine-room. If it be argued that under Article 15(a), 33 U.S.C.A. § 91 (a), she may not give such a signal unless she have "way upon her" and that she has not "way upon her" until she begins to move through the water, we answer that while that may demonstrate the finality of her first choice, in any event it is utterly untenable that she may acquire any appreciable speed without warning. Hence it follows that the only duty of a moving vessel towards a "lying-to" vessel, which like the Bedford has given no signal but double blasts, is to "ascertain" her position and keep away from it. It is for this reason that, as we have said, the Kungsholm's speed before the collision was immaterial. We have been unable to find any authority on the question except an apparently favoring dictum in The Canada, 63 Lloyd's List Rep. 112, 115, 117.

 As we said at the outset, the Bedford also charges as faults against the Kungsholm that she did not back when she inferred from the apparent approach of the Bedford's whistle that that vessel was changing her position; and that, when she sighted the Bedford, she put her rudder hard right instead of hard left. The first of these charges rests upon the evidence of the Kungsholm's log which recorded the stop order as given to the engine room at 5:02 by the bridge clock, and the backing order at 5:03. On the other hand the master swore that the two orders were given in immediate succession. The entry does not discredit him, because the clock— like many of the kind—went by jumps of one minute, so that two events only a few seconds apart could be recorded as separated by a minute. Unfortunately the judge made no finding upon the issue, but he appears to have accepted the master's testimony in general. Furthermore, as soon as the Kungsholm's master learned that the Bedford was in fact not "stopped", he must have been aware that an emergency had arisen, and there is every antecedent prob-

ability that the backing order followed immediately upon the stop order. Perhaps the right rudder was wrong navigation after the vessels had sighted each other, and by a hard left rudder the Kungsholm would have cleared the Bedford's stern, or at most the bluff of her starboard bow would have merely butted the Bedford's starboard quarter. That is not, however, wholly certain. When the Bedford finally loomed out of the fog, crossing the Kungsholm's bows, it was indeed an emergency, and the Kungsholm's navigation is not in any case to be severely judged. Her master was entitled to assume that the Bedford would back, as she did, and that she would also put her rudder hard left and swing off the port, as she did not. If she had done this, presumably she would have made as great a change in heading as the Kungsholm, which did not back her starboard screw to help her turn. A turn by the Bedford of 45 degrees would have either avoided collision altogether, or have brought the two together at a very slight angle. As it was, the Kungsholm's way was nearly off. All things considered, it would be quite unwarranted to rest liability upon such speculative considerations. Besides, the Bedford was in any event so grossly at fault that we will not look too nicely at the Kungsholm's navigation.

Decree affirmed.