## THE WHITECASTLE.

### THE BBL-106.
### No. 3020.

District Court, W. D. Louisiana, Lake Charles Division.

Sept. 30, 1947.

Franklin, Kelly & Fellbaum, of Houston, Tex., and Moss & Graham, of Lake Charles, La., for libelant.

Terriberry, Young, Rault & Carroll, of New Orleans, La., and McCoy, King, Anderson, Hall & Swift, of Lake Charles, La., for claimant and cross-libelant.

PORTERIE, District Judge.

We believe our findings of fact will be a sufficient narrative so that a formal statement of the case will not be necessary.

### Facts.

I. On March 3, 1945, at about 8:30 p. m., the pusher type towboat Whitecastle was proceeding in a northerly direction in Harvey Canal, Louisiana, bound in the canal towards the Mississippi River locks. The Whitecastle was pushing two loaded oil barges, the BBL 106 and BBL 107, in that order. The entire flotilla was owned by cross-libelant. The BBL barges were each 200 feet long and forty feet in beam.

II. At the same time the tug Leta was bound south in the canal, having just locked through from the Mississippi River and having just emerged from the locks. At the time the Leta was pushing four empty tank barges. These were the FBZ 76 and FBZ 77, each 205 feet long and forty feet in beam, and the Z 61 and Z 65, each 135 feet long and thirty-two feet in beam. The two FBZ barges were made up one behind the other on the port side of the tow, and the Z barges were made up one behind the other on the starboard side of the tow. The Leta's tow was thus at least (for it is difficult to keep a tow exactly parallel to the bank) seventy-two feet wide. The Leta herself was made up with her port side to the starboard quarter of the FBZ 77.

III. When the tows were about one-half mile apart, one-blast whistles were exchanged for a port to port passage. After the exchange of signals the Whitecastle and her tow altered course to their starboard and pulled over toward their own starboard bank, thereafter continuing to run parallel to that bank, about thirty or forty feet off the bank, and well to their own starboard side of the center line of the 300-foot canal. The Whitecastle and her tow continued to navigate on this course, parallel to their own starboard bank and well to their own starboard side of the center line of the canal, up to and including the time of collision.

IV. From the time that the Leta first sighted the Whitecastle the Leta kept her searchlight focused on the Whitecastle. The pilot of the Whitecastle shook his searchlight at the Leta to advise the pilot of the Leta that the Leta's searchlight might embarrass the navigation of the Whitecastle; the searchlight of the Whitecastle being immediately thereafter focused to its own starboard bank and continuing there until after the collision. The rapid shaking of the Whitecastle's searchlight at the Leta did not embarrass the Leta or in any way contribute to the collision. It is a recognized and customary signal in these waters by which one pilot may ask the other pilot to turn away his searchlight. The Leta disregarded this signal but continued the focusing of its searchlight on the Whitecastle. We find that the Leta's playing with its searchlight is indicative of being at a loss how to navigate; or that the Leta threw its searchlight toward the forward port corner of its forward barge FBZ 76, its most forward left point, to light this dangerous corner, because there was no red light there.

V. After the exchange of the one-blast signal with the Whitecastle the Leta did not alter her course to starboard, but, on the contrary, continued her same course and speed. This course was not to her own starboard side of the narrow channel, but actually was in such a position in the channel that the port side of her tow was well over to her own port side of the center line, encroaching upon the waters of the Whitecastle. The attention of all hands on the Leta were principally directed to clearing the craft tied up along the Leta's right hand bank of the canal, rather than being directed to the effecting of a safe port to port passage with the Whitecastle. The Leta, with its tow in double file, took twice the space to pass that the Whitecastle took, with its tow in single file.

VI. The Leta, failing to alter her course to her starboard and continuing to encroach with the port side of her tow on the Whitecastle's side of the canal, brought her tow into collision with the tow of the Whitecastle, the forward port corner of the barge FBZ 76 of the Leta's tow coming into collision with the forward port corner of the barge BBL 106, the FBZ 76 running up on to the barge BBL 106 for about thirty feet of each barge's length. The point of collision was well to the Whitecastle's side of the center line of the canal.

VII. The sole effective cause of the collision was the Leta's failure to pull to her own starboard to effect the port to port passage to which she had agreed, but, on the contrary, navigating with a substantial portion of the port side of her tow projecting well into the port side of the canal, thus encroaching upon the waters of the Whitecastle.

VIII. Each tug was herself exhibiting proper lights. There is grave doubt whether the barge FBZ 76 actually carried the red light which it was by law required to carry on its port corner. Even if the light were there prior to the collision, it was not of the character of light required by the rules, being unscreened and being placed merely on the deck of the barge less than ten feet above the water. The BBL 106 had red and green side lights, which were also unscreened and were closer to the water-line than required by the rule, but this did not contribute to the collision because they could have been seen had the Leta been paying attention to the Whitecastle rather than directing all its attention to passing the boats moored to the starboard side of the canal.

IX. While the Whitecastle had no one posted at the head of the tow she had a deckhand on lookout in the wheel-house, which under the circumstances and in these waters is felt to have been a sufficient lookout, but, if not, it did not contribute to the collision. On the other hand the Leta had no one charged with the exclusive duty of acting as lookout, but, on the contrary, the one person posted at the head of the tow as a claimed lookout was directing all of his attention not at the approaching Whitecastle and her barges but to passing the boats and barges moored between the Leta and her own right hand bank of the canal.

X. The Whitecastle and her tow were traveling at an appropriate speed under the circumstances, having reduced her speed when the Leta was first sighted.

### Law.

I. It is a well settled principle of collision law that liability for collision damage is upon the vessel whose fault caused the collision. The Standella, 5 Cir., 1940, 108 F.2d 619; The Doris Dean, 5 Cir., 1943, 135 F.2d 731.

II. The collision in this case was caused by the sole fault of the Leta in failing to keep to her own side of the canal. This came about on the part of the Leta by her failure to have an adequate lookout and, in crowded waters, paying no proper attention to the approaching tow, and directing all her attention to passing the vessels between her and her starboard side of the canal.

III. Where, as is the case with the Leta and her tow here, the fault of one vessel is gross and glaring, and that fault is sufficient to account for the collision, that vessel cannot escape the effects of that fault by seeking to raise doubts about the navigation and management of the other. A/B Svenska Amerika Linien v. Standard Oil Co. (Kungsholm), 2 Cir., 1939, 105 F.2d 924; The Bright (The Hawaiian), 4 Cir., 1941, 124 F.2d 45; Theothilatos v. Martin, 4 Cir., 1942, 127 F.2d 1016; The City of New York, 147 U.S. 72, 13 S.Ct. 211, 37 L.Ed. 84; The Standella, supra.

IV. The collision having resulted from the sole fault of the Leta, the libel should be dismissed and cross-libelant given a decree for its damages, interest and costs.

V. The collision having been the sole fault of the Leta, it becomes unnecessary to pass upon the defense raised by the Whitecastle that the libelant was guilty of laches in the filing of the libel.

### Discussion.

It is mutually admitted that there is an irreconcilable conflict of testimony between the witnesses of the two vessels. The Whitecastle witnesses gave the impression of telling the truth, particularly Captain Pierce, who was corroborated substantially by the others with him.

At the conclusion of this case, our mind was thoroughly satisfied that the place of collision or contact was on the side of the canal belonging to the Whitecastle and the cause of that was that the Leta half of the canal was considerably taken by moored vessels and, in passing around those vessels, it went beyond its middle line. The Leta did use its searchlight illegally and that was either caused by: (a) A loss of direction to navigate, or (b) the fact that it had no red light on the forward port corner of its forward barge FBZ 76, and the searchlight was thrown over this barge to show this corner in the attempt to prevent an accident. Then, it followed that the searchlight of the Leta blinded the navigators of the Whitecastle, not in preventing them from keeping close to the bank on its right-hand side, but sufficiently blinding them from being able to see in time the forward barge of the Leta in the Whitecastle's path.

On the point of the want of a lookout on the Whitecastle, at the very front of its tow, and granting that this tow point was several hundred feet ahead of the pilothouse of the Whitecastle, we find that the Leta had no lookout either. The record will disclose that Duhon was the lookout man for the Leta, but Duhon, during the entire time of and just before the collision, was entirely engaged, not at looking in the direction the Leta was going but in guiding Captain Comeaux of the Leta to see that he did not run into the moored vessels on the righthand side of the Leta.

Comeaux, captain of the Leta, said to the Coast Guard officer making the investigation that he "* * * was moving along at his same speed with the port side of his tow about in line with the middle of the canal." Too close to the center line! And with the other circumstances we believe that the Leta went beyond the middle of the canal just before the collision. Of the two other men on the Leta, one was in the engine room (could see nothing) and the other was on the deck of the Leta herself, coiling rope. So neither boat had a lookout.

Captain Comeaux, on direct examination, stated as follows:

"Q. At the time of this collision were there any boats near the vicinity of the collision? A. They had boats on both sides.

I just cleared one boat on the Texas Company side, the tug Salvador, a small boat.

"Q. How wide is the tug Salvador? A. I don't know exactly; about fourteen feet.

"Q. And what is your estimate of the width of this boat—did you say there was a tug, the tug Salvador and what else? A. A small barge.

"Q. What is your estimate of the width of this barge? A. It was not over twenty feet."

Again, the same witness on cross-examination:

"Q. When you passed this tug and barge on your right-hand side how far were you away from the place the collision occurred? A. It was not so far. I had just passed it."

Then, Captain Pierce, under cross-examination, testified as follows:

"Q. Isn't it a fact there were some large wooden barges moored there? A. Not on my right-hand side where we had wreck, there was none. Maybe on other end he had some over there, but not where I was."

The Leta's tow evidently was across the middle line of the canal at time of collision, because it takes time to bring back a long tow.

The matter of speed is stressed by the libelant but the record shows that neither vessel stopped, nor reversed, prior to the collision. It is true that the Whitecastle was moving slightly faster than the Leta but it did reduce its speed at the time of signaling port to port passage from seven miles per hour to five miles per hour—not an excessive speed under the circumstances. The Whitecastle never encroached on the Leta's right-of-way; therefore, it can not be cast with negligence because of its speed.

On the point of danger signal: Neither vessel gave the danger signal blow, so they are equally at fault there, and there can be no inference that a danger signal whistle would have averted the accident.

As to the competence of the two crews, it is true that the Captain of the Whitecastle admitted that he did not know all of the complicated rules and regulations concerning intra-coastal navigation, but displayed on the witness stand far greater intelligence, dependability and truthfulness than the Captain of the other towboat. The one important rule for safe navigation in this relatively narrow intracoastal canal was followed by the Captain of the Whitecastle and not followed by the Captain of the Leta and that is that the Whitecastle kept to its own starboard side of the canal and did not cross the middle line, which the Leta did not do.

In the matter of lights, neither vessel had the proper lights at the head of the tow; neither vessel had its forward lights screened, as required by the rule; each had only battery lights lying on the deck. The forward lights on both vessels were below a point ten feet above the water line; this is a mutual violation of the rule.

So, we say in this case, as was said by Judge Learned Hand in Woodruff et al. v. Delaware, L. & W. R. Co., 2 Cir., 130 F.2d 121, at page 123, "When one vessel is guilty of glaring fault, we will not too jealously scrutinize the navigation of the other [vessel]."

As to making deductions from the positions of the vessels after the collision to determine who was at fault at time of collision, a method of reasoning stressed by the libelant, we repeat what we said at the trial (Tr. pp. 141–143):

"Since force is equal to mass times acceleration, the (greater) mass was the Whitecastle and its tow, because the two barges being towed by the Whitecastle were heavily ladened, when in the case of the Leta and its tow there were four barges that were empty. So there is an allowance to be made there because of the different masses. That has to be considered in connection with the physical situation after the collision.

"However, the Court cannot give too much consideration to the physical situation after the collision, and after the vessels had all come to rest, in determining who was right and who was wrong, because the law of force being equal to mass times acceleration more or less fades out, or is undeterminative in this instance, because if we correctly examine into the facts we find that the heavily-ladened barges were nat-

urally considerably submerged in the water, while the unloaded barges rose, perhaps, some eight or ten feet out of the water, which explains why the barges without draft naturally arose on top of those that were loaded and deeper in the water, and the question of how far each went, or how far one went on top of the other, and the position of the barges relatively after the accident cannot, in my opinion, help much in a determination of who was wrong at the time of the collision.

"I do not want to stop the examination—you may continue it all you wish—but I might as well announce now that in the Court's opinion the main question is, what occurred before that collision. It is this question which, in the opinion of the Court, is more determinative of who was at fault than any other."

We have signed the order permitting an aerial photograph of the area to become a part of the record on appeal, designated Libelant's Exhibit "A." At trial, we sustained objections (and we believe correctly) to its admission. In our findings of fact and conclusions of law, however, we have given consideration to this photograph. Granting that the Whitecastle was moving towards and facing an illuminated river front (the object of proof by the photograph) and to some degree, obviously, the numerous lights might have baffled the navigators of the Whitecastle, especially when added to the troublesome searchlight of the Leta, we find that the course of the Whitecastle was well controlled and continuously parallel to and near its right-hand bank, notwithstanding.

There was no want of a map in the trial of this case, for the record will show two maps of the whole canal, mutually filed, prepared by the Corps of Engineers, War Department, United States Army—superior to which there is none. These two maps, of different character, drawn to scale, gave all possible information and afforded both sides any and all opportunity for questioning of the witnesses on any phase of this collision.

For any and all of the above reasons, we shall sign a decree dismissing the libel herein and for all costs of court to be taxed against libelant.